Maureen Alice MALLOY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6873.

Court of Appeals of Alaska.

May 19, 2000.

Rehearing Granted June 16, 2000.

1268

Larry Cohn, and Dan S. Bair, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

During early November 1995, Maureen Alice Malloy restrained another woman, K.H., in a motel room in Spenard. For more than a week, Malloy inflicted many brutal physical and sexual assaults on K.H., all the while keeping her sedated with a combination of alcohol and muscle relaxants. Finally, during the early morning of November 9, Malloy drove K.H. to a remote location on the Campbell Airstrip Road; there, Malloy murdered K.H. by slashing her throat and stabbing her in the chest. A few days later, Malloy arranged for a friend to mail the murder weapon and K.H.'s belongings to another friend of Malloy's in Washington state. Malloy telephoned this friend and instructed her to burn the contents of the package when it arrived.

Based on this conduct, Malloy was convicted of kidnapping, first-degree murder, and tampering with evidence. Superior Court Judge Elaine M. Andrews sentenced Malloy to a composite term of 159 years' imprisonment, with no eligibility for discretionary parole during the first 129 years of this sentence.

Malloy now appeals her convictions, alleging that the superior court committed various procedural and evidentiary errors. For the reasons explained here, we affirm Malloy's convictions.

Malloy also appeals her sentence. She contends that her sentence is excessive. She also argues that a portion of AS 12.55.125(a), the sentencing statute for first-degree murder, is unconstitutional. We reject Malloy's argument that her sentence is excessive, but we agree that the challenged portion of AS 12.55.125(a) is unconstitutional. For the reasons explained below, we direct the superior court to delete the restriction on Malloy's eligibility for discretionary parole; she will be eligible for parole after serving 53 years (one-third of her composite term).

### Issues Affecting the Validity of Malloy's Conviction

1. The ex parte hearings concerning Malloy's son, J.M.

Malloy had two children, J.M. and D.M., who were expected to be witnesses against her. J.M. ultimately testified both before the grand jury and at Malloy's trial. On the day following Malloy's arrest (December 26, 1995), the court imposed a bail condition that barred Malloy from having contact with any witness in her case—including her children. Several months later, Malloy asked the superior court to vacate this bail condition. After hearing argument on this motion, Judge Andrews reaffirmed the condition.

At about the same time that Malloy was arrested, the children were taken into emergency custody by the Division of Family and Youth Services, and the State initiated Child–in–Need–of–Aid ("CINA") proceedings with respect to both children. The superior court appointed attorney Cynthia Strout to be the children's guardian ad litem. The children made statements suggesting that Malloy had subjected them to abuse and

neglect. As a result of these statements, the superior court entered an order in the CINA case that likewise prohibited Malloy from having contact with J.M. and D.M..

In mid-June 1996, thirteen-year-old J.M. ran away from foster care. On June 18th, the prosecuting attorney and J.M.'s guardian *ad litem* each filed affidavits requesting a material witness warrant for J.M.'s arrest. Based on these affidavits, and without notice to Malloy, Judge Andrews issued the requested warrant on June 19th.

Two days later, on June 20th, J.M. was apprehended and placed in custody at the McLaughlin Youth Center. Later that same day, Judge Andrews held an *ex parte* hearing attended by the prosecutor, J.M.'s guardian *ad litem*, and J.M. himself. J.M.'s social worker and a youth counselor from McLaughlin were also present. Judge Andrews stated that she wished to hear from these parties to see if there were any confidential matters that needed to be discussed before she notified Malloy and her attorney of the issuance of the material witness warrant and J.M.'s subsequent arrest.

Both the prosecutor and the guardian *ad litem* expressed concern that Malloy would attempt to influence J.M. if she knew that he was having emotional difficulties and that his placement was not secure. Judge Andrews found that there were legitimate reasons for keeping the proceedings *ex parte* for a little longer. She stated that she expected J.M.'s placement at McLaughlin to be temporary, that J.M. would soon be placed in another foster home, and that, because Malloy had been ordered to have no contact with J.M., she believed it was important that Malloy not know how to contact J.M. Judge Andrews then addressed J.M. personally. She encouraged J.M. not to run away from his next placement, and she promised that if J.M. cooperated with his social worker and his guardian *ad litem*, she would "do what [she could] to move [J.M.] out of [McLaughlin] ASAP."

Three weeks later, Judge Andrews issued a written order informing Malloy of these *ex parte* proceedings. The judge told Malloy that the record of the *ex parte* proceedings (the application for the warrant on June 18th, and the hearing on June 20th) had been sealed and would be preserved.

Upon learning of the *ex parte* proceedings, Malloy filed a motion to disqualify Judge Andrews. Malloy asserted that the judge, by holding these proceedings *ex parte*, had violated Malloy's constitutional rights to due process and confrontation of witnesses. Malloy further asserted that the judge's actions either demonstrated actual bias against Malloy or at least created an appearance of impropriety.

Recognizing that Malloy was disadvantaged in not knowing the contents of the *ex parte* proceedings, Judge Andrews announced that she intended to apprise Malloy of what had occurred *ex parte*, but she wanted to give J.M.'s guardian an opportunity to object to the disclosure of any confidential information. For that reason, Judge Andrews announced that she intended to hear from the guardian *ex parte* to see what her objections might be.

On July 29th, Judge Andrews heard from J.M.'s guardian *ex parte*. The guardian asked Judge Andrews not to reveal a small portion of the June 20th hearing—the portion in which the guardian discussed the opinions and diagnosis of J.M.'s mental health therapist. Judge Andrews granted this request, and then ordered disclosure of all other parts of the *ex parte* proceedings.

With the contents of the *ex parte* proceedings no longer secret, Judge Andrews renewed her consideration of Malloy's motion to disqualify her. The judge found that, because the circumstances justified the *ex parte* proceedings, there was no impropriety, either actual or apparent. Judge Andrews's ruling was subsequently affirmed by Superior Court Judge Larry Card.

On appeal, Malloy contends that the three *ex parte* proceedings—the June 18th application for the material witness warrant, the June 20th hearing regarding J.M.'s custody at McLaughlin Youth Center, and the July 29th *ex parte* objections by J.M.'s guardian *ad litem*—violated her constitutional right to be present at all stages of the proceedings against her. Malloy also contends that Judge Andrews's decision to hold these three

proceedings *ex parte* created an appearance of impropriety that required Judge Andrews's disqualification under Alaska Judicial Conduct Canon 3 E(1).[1]

### (a) Malloy's right to be present

In general, criminal defendants have the right to be present at every stage of the proceedings following their indictment.[2] This right is rooted in an accused's constitutional rights to receive due process of law and to confront the witnesses against them.[3] The defendant's right to be present extends not only to those proceedings in which the defendant confronts adverse witnesses or evidence but also to "any trial-related proceeding at which the defendant's presence has a 'reasonably substantial' relation to the defendant's ability to defend against the criminal charge"—that is, to "any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure." [4]

As explained above, there were three *ex parte* proceedings in this case. The first was the application for the bench warrant for J.M.'s arrest. The second was the hearing that ensued following his arrest. The third

was the guardian *ad litem's* presentation of her objection to disclosing the short portion of the second hearing that revealed the opinions of J.M.'s therapist. Malloy makes no attempt to distinguish these three proceedings; she asserts simply that she was entitled to attend all of them.

We see significant differences among the three proceedings. In particular, we can readily envision circumstances in which a court will be required to act promptly to ensure the attendance of witnesses who threaten to flee or who otherwise threaten to render themselves unavailable to testify. If we interpreted the Constitution to require the defendant's presence at all such proceedings, then a trial court facing such a situation would be powerless to act until the defendant's presence was secured or personally waived.[5] Such a result appears unreasonable—thus indicating that we should construe the Constitution to grant trial judges at least some authority to entertain an *ex parte* application for a bench warrant to arrest and detain a material witness.[6]

We do not, however, need to resolve this issue in Malloy's case. Instead, we conclude that any error in holding these pro-

---

1. Canon 3 E(1) provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned".

2. *See, e.g., Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975) (A defendant has a constitutional "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.").

3. *See Henry v. State*, 861 P.2d 582, 592 (Alaska App.1993) (quoting *Wamser v. State*, 652 P.2d 98, 101 n. 10 (Alaska 1982)).

4. *Henry*, 861 P.2d at 593 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987)).

5. *See State v. Hannagan*, 559 P.2d 1059, 1063–65 (Alaska 1977).

6. *See*, for instance, *State v. Hamons*, 248 Kan. 51, 805 P.2d 6 (1991) (an *ex parte* hearing to consider the State's request to require a subpoenaed witness to post bond did not violate the defendant's Sixth Amendment and statutory rights of confrontation where "no evidence of testimony regarding any aspect of the crime was dis-

cussed"); *State v. Douglas*, 234 Kan. 605, 675 P.2d 358, 361 (1984) (a hearing to decide whether a witness should be held in contempt could lawfully be held outside the presence of the defendant when the only issue litigated was the witness's own defense to the contempt accusation). In *Hamons*, the state asked the trial court to require a subpoenaed witness to post bond to secure her presence at trial. *Id.* at 14. The trial court conducted an *ex parte* hearing to consider the state's request; neither Hamons nor his counsel were present. (After the witness assured the trial judge that she would attend the trial and testify truthfully, the judge decided that no bond was required.) *Id.*

On appeal, Hamons argued that this *ex parte* hearing violated his Sixth Amendment and statutory rights of confrontation. However, the Kansas court rejected Hamons's claims. The court noted that the only issues litigated at the *ex parte* hearing were whether the witness would honor the subpoena and whether she would be required to post bond. *Id.* The court stressed that "no evidence or testimony regarding any aspect of the crime was discussed," and that the district attorney was not allowed to examine the witness concerning the substance of her intended testimony. *Id.*

ceedings *ex parte* was harmless beyond a reasonable doubt. First, we note that Judge Andrews disclosed the fact of the proceedings and practically all of their contents within in a reasonable period of time. The one exception was a 45–second portion of the June 20th hearing where the guardian *ad litem* discussed the opinions of J.M.'s therapist. But this portion of the second hearing was arguably protected from disclosure by Alaska Evidence Rule 504(b).[7] Even if Malloy had been present at the June 20th hearing, J.M.'s guardian would arguably have been entitled to present the therapist's opinion outside Malloy's presence.[8] Malloy presents no specific argument that she was entitled to disclosure of the therapist's opinion.

Malloy asserts that her case is factually similar to *Carman v. State*[9], where the supreme court held that a magistrate violated the defendant's right to be present when the magistrate allowed the State to present evidence *ex parte* to rebut the defendant's request for bail reduction. Malloy argues that, just as in *Carman,* the request for a material witness warrant was tainted by allegations in the guardian *ad litem*'s affidavit that Malloy might try to intimidate J.M. or otherwise urge him not to testify.

While *Carman* is facially similar to Malloy's case in some respects, it is distinguishable from Malloy's case in one crucial respect: the allegations contained in the guardian's affidavit were not material to the issue being considered by Judge Andrews. The judge was being asked to decide whether to issue a bench warrant for J.M.'s arrest as a material witness. This decision hinged on J.M.'s status as a material witness and whether court process was necessary to ensure his appearance at Malloy's trial. J.M.'s status as a material witness has never been disputed, and the fact that he ran away from his foster care placement (and that his whereabouts remained unknown) was a clear indication that court process might be needed to ensure his appearance at trial.

Because the guardian's allegations of potential witness tampering by Malloy (and/or her associates) were immaterial to the question posed to Judge Andrews, we conclude beyond a reasonable doubt that these allegations had no effect on Judge Andrews's decision to issue the material witness warrant. Because the allegations against Malloy did not affect the judge's decision to issue the warrant, and because those allegations were fully revealed to Malloy a short time later, Malloy was not prejudiced by the fact that the guardian's affidavit was initially presented *ex parte*.

Malloy also argues that her case is similar to *Brown v. State*[10], where the supreme court held that a defendant was prejudiced when he was excluded from a hearing to determine whether his wife would waive her spousal immunity and testify at his trial. Brown was charged with assault and illegal possession of a concealable weapon.[11] Brown's wife, Stella, was purportedly a witness to the alleged crimes, and Brown's attorney was trying to persuade Stella to testify on Brown's behalf.[12] At trial, the defense attorney asked the court to hold Stella as a material witness or make her post bail to guarantee her appearance. The trial judge perceived, however, that Stella had a spousal privilege not to testify at her husband's trial, and it would therefore be improper to hold Stella as a material witness unless she was willing to relinquish that spousal privilege. The judge therefore held a hearing to determine whether Stella was willing to testify. Both attorneys attended this hearing, but Brown did not.[13] At the hearing, Stella stated that she would claim her spousal privilege and would not testify. Consequently, Brown

---

7. *See* Evidence Rule 504(b) ("A patient has a privilege to refuse to disclose ... confidential communications made for the purpose of diagnosis or treatment of the patient's ... mental or emotional conditions").

8. *See* Evidence Rule 504(c), which authorizes a guardian *ad litem* to assert the psychotherapist-patient privilege on behalf of their ward.

9. 564 P.2d 361 (Alaska 1977).

10. 372 P.2d 785 (Alaska 1962).

11. *Id.* at 786.

12. *Id.*

13. *Id.* at 786–87.

withdrew his motion to hold Stella as a material witness.[14]

On appeal, Brown claimed that holding this hearing in his absence violated his rights under Criminal Rule 38.[15] Brown asserted that he was prejudiced because, if he had been present at the hearing, he would have had a calming influence on his wife and she might have consented to testify on his behalf.[16] The supreme court agreed that Brown's presence at the hearing could have altered his wife's decision. The court concluded:

> We believe that under the circumstances of this case, [Brown's] presence was required by [R]ule 38 and that his right to be present was as vital to his defense as his specific constitutional right to be confronted with the witnesses against him.

*Id.* at 789.

But, again, the *Brown* decision is distinguishable from Malloy's case. In *Brown*, the question was not whether Brown's wife would honor her trial subpoena or whether the court should take steps to insure that the subpoena would be honored. Rather, the question was whether Stella Brown could be ordered to testify at all. Mrs. Brown held a privilege to refuse to testify at her husband's trial, and the question was whether she would waive that privilege and consent to testify on Brown's behalf. The supreme court reversed Brown's conviction because the court was convinced that Brown's presence could have made a difference in his wife's decision to waive or assert the privilege.

In Malloy's case, on the other hand, the only issue considered by Judge Andrews at the *ex parte* hearing was whether the court should use its coercive powers to ensure that J.M. appeared at trial. J.M. was not questioned regarding the substance of his intended testimony, nor did anyone suggest that he had a privilege not to testify.

Moreover, a crucial aspect of *Brown* is that, following the challenged hearing, Brown's wife refused to testify and thus became unavailable as a defense witness. In Malloy's case, however, the *ex parte* proceedings were undertaken to ensure that J.M. remained available as a witness. This goal was achieved.

For these reasons, we conclude that even if Judge Andrews violated Malloy's right to be present when she conducted the *ex parte* proceedings in this case, any error was harmless beyond a reasonable doubt.

### (b) Malloy's challenge to Judge Andrews

■ For related reasons, we reject Malloy's argument that Judge Andrews should have been disqualified from this case for conducting the three *ex parte* proceedings. Under the circumstances of this case, there was at least colorable reason to conduct the challenged proceedings in Malloy's absence. (See the cases discussed in footnote 6, *supra*.) Reasonable persons, apprised of all the facts, would not suspect Judge Andrews of harboring bias against Malloy.

### 2. The admissibility of Malloy's three interviews with the police

Malloy was interviewed three times by the police: on November 15th, on December 12th, and again on December 27th (following her arrest). She asked the trial court to suppress these statements, contending that the police had violated the *Miranda* rule during all three interviews and that the statements she made during the November 15th interview were involuntary.[17] Judge Andrews agreed with Malloy that the police had violated *Miranda* during the November 15th interview when they failed to heed Malloy's request for counsel. Accordingly, Judge Andrews suppressed all of the November 15th interview that followed the *Miranda* violation. However, Judge Andrews rejected Malloy's other attacks on the November 15th interview, and she further ruled that the

---

**14.** *Id.* at 787.

**15.** *See* Criminal Rule 38, which generally requires a defendant's presence at all post-indictment proceedings.

**16.** *Id.* at 788.

**17.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

December 12th and December 27th interviews were admissible. On appeal, Malloy renews her attacks on the admissibility of her statements.

*(a) The November 15th interview—Miranda*

Malloy argues that her entire November 15th interview should have been suppressed because she was in custody and the police failed to advise her of her rights under *Miranda*.

Malloy concedes that the November 15th interview was held at her behest: she contacted the police and told them that she wanted to talk to them about her suspicions that her ex-husband was sexually abusing their children. Because Malloy had no vehicle, the police drove her and her children to the police station. Malloy was taken to an interview room where she was interviewed by two detectives—first by Grimes and then by Baker—for a total of three and a half hours.

At the beginning of the interview Detective Grimes told Malloy that the police were investigating the death of K.H., explaining that they were "trying to put together her last movements". Malloy told Grimes, "I can help you there." Malloy began willingly (and verbosely) to answer the officer's questions. Grimes asked Malloy if she had any hesitation about speaking to the police, and she replied, "Not one bit."

■ The interview continued for over 50 pages of transcript in a fairly friendly, non-accusatory manner. Malloy described how she met K.H. in Juneau, and she told the police that, in the weeks preceding her death, K.H. appeared to be using drugs and to be in trouble. Malloy also declared that she suspected that K.H. was running around with the Hell's Angels, and she hinted that this group might have an interest in Malloy's investigation of her own ex-husband's abuse of their children. Several times during this portion of the interview, Malloy expressed fear that she would suffer retaliation if she cooperated with the police. Malloy told the detectives, "I don't want to be the next person laying there with my neck slit open" and "I don't want to die."

During the second part of the interview, Malloy told Detective Baker that she had seen K.H. on the night of her death. Malloy stated that she had been driving K.H. to a friend's house when K.H. jumped out of the car at the corner of Tudor and Arctic and ran away. When Malloy said this, Baker accused Malloy of knowing more about the homicide than she was saying, but he did not accuse her of killing K.H. Instead, the detective suggested that Malloy had taken K.H. to the house of a man known as "Beaver", and that Malloy knew how K.H. had died. Eventually, Malloy admitted that K.H. had not jumped out of the car at Tudor and Arctic—that Malloy had in fact dropped K.H. off near Beaver's house.

At this point, Malloy and Detective Baker engaged in the following colloquy:

*Detective Baker:* I verified that [K.H.] came back to your place about 6 o'clock in the afternoon.

*Malloy:* Was it that late? I don't have a clock in there.

*Baker:* Yeah, it was that late. And I also know that she was dead within twelve hours. And I verified the other car, the car with the bad rear end damage, and we're getting all the phone records from the Spenard Hotel. And we're going to search your room.

*Malloy:* Fine.

*Baker:* And I don't think we're going to find anything. But I'm telling you—unless you help us, you're in deep trouble and your kids are in deep trouble. So let's start thinking about somebody beside yourself.

*Malloy:* I'm not just thinking about myself.

*Baker:* Let's start thinking about your kids.

*Malloy:* That's all I'm thinking about, is my children.

*Baker:* Let's start thinking about your kids.

*Malloy:* They only have me.

*Baker:* Well, let's start thinking about them and doing what's right for them. Now you tell me what happened.

*Malloy:* That's what happened.

\* \* \*

*Baker:* You talked to Beaver on the phone.

*Malloy:* I didn't say any names; I just said she's out front.

*Baker:* And what did he say?

*Malloy:* I hung up the phone.

*Baker:* There was no conversation?

*Malloy:* He said "thank you".

*Baker:* The next day . . .

*Malloy:* I'm gonna be done now.

*Baker:* No, you're not.

*Malloy:* That's bullshit.[18]

*Baker:* No, you're not. I need a tape. I need a tape. The next day . . .

*Malloy:* I saw the [report of K.H.'s death on the] news.

Both in the trial court and on appeal, Malloy relies heavily on this exchange to prove that she was effectively in custody, and that the police were not going to allow her to stop the interview until she told them everything she knew. In particular, Malloy characterizes her statement, "I'm gonna be done now," as an invocation of her right to silence and a request to end the interview. She characterizes the detective's response—"No, you're not. I need a tape."—as a refusal to honor this request and an order for her to continue.

We admit that the transcript of the interview appears to support Malloy's characterization. But Judge Andrews reviewed the videotape of this interview and concluded that, when Malloy stated "I'm gonna be done now," she was reiterating her fear that she would suffer retaliation for talking to the police. Judge Andrews concluded that when the detective replied, "No, you're not," he was attempting to reassure her. Judge Andrews also found that the detective's additional comment, "I need a tape," was not a

continuation of "No, you're not." Rather, the detective uttered these words because, coincidentally, the tape recorder sitting on the table in the interview room had run out of tape.

Because Judge Andrews relied on the videotape in making her ruling, we too have reviewed the videotape. Malloy's tone of voice and demeanor when she uttered these words, and her unhesitating resumption of the conversation, all support Judge Andrews's interpretation of this episode. Moreover, the detective can be seen manipulating an object on the table in front him while he says, "I need a tape. I need a tape." Finally, as we noted before, Malloy repeatedly expressed her fear of retaliation before she and the detective engaged in the colloquy at issue here. All of these factors lead us to affirm Judge Andrews's finding that both Malloy and the detective were referring to Malloy's fear of retaliation rather than Malloy's desire to end the interview.

Malloy also points to a later portion of the conversation as an instance in which the police refused to honor her request to end the interview. The detective continued to press Malloy to disclose her knowledge of how K.H. had died. Malloy responded,

*Malloy:* You're trying to get me killed.

. . .

*Baker:* Well, tell me, have you been threatened since you've been up here? By Beaver or anybody? Since this happened?

*Malloy:* I guess I'm not gonna say any more.

*Baker:* So, in fact, Beaver did tell what he did . . .

*Malloy:* He did never . . .

Malloy points to her statement, "I guess I'm not gonna say any more," as a clear indication of her desire to end the interview. But, again, the videotape clarifies the meaning of this exchange. Following Baker's question concerning whether Malloy had been threatened, Malloy paused for several seconds and then finally announced that she

---

**18.** The transcript has Malloy saying "Yeah, well" at this point, but her actual words are clear on the videotape.

would not say any more. But she immediately resumed answering Baker's questions. Again, Malloy's tone of voice and her demeanor support a finding that Malloy was refusing to say anything more concerning the threats that she may have received—not refusing to continue her conversation with Detective Baker.

It is true that the interview became increasingly confrontational as it progressed. Further, Malloy points to other incidents during the interview which arguably could support a finding of custody. But reviewing the interview as a whole and considering all the surrounding circumstances, we agree with Judge Andrews that a reasonable person in Malloy's position would have believed that they were free to go if they wished.[19] Accordingly, we uphold Judge Andrews's ruling that Malloy was not in custody during the November 15th interview and that the police thus had no obligation to advise her of her *Miranda* rights.

### (b) The November 15th interview—voluntariness

 Malloy also argues that, even if she was not in custody for *Miranda* purposes, her statements during the November 15th interview were nevertheless involuntary. The record does not support this claim. Statements are involuntary if the police, through promises or threats, undermine a suspect's will to resist and elicit a confession that is not freely given.[20] The main impediment to Malloy's contention that her statements on November 15th were involuntary is the fact that Malloy, "despite police pressure to talk, said nothing to directly inculpate [her]self in . . . [the murder]. [She] engaged in a calculated effort to assuage police suspicions and to make it appear that [she] was reluctantly but honestly cooperating with

their investigative efforts."[21] We thus conclude that Malloy's statements on November 15th were voluntary.

### (c) The December 12th interview

Malloy consented to be re-interviewed on December 12th. She contends that this second interview should be suppressed because it was the fruit of the purported *Miranda* violation on November 15th. Because have just rejected Malloy's contention that there was a *Miranda* violation on November 15th, we also reject Malloy's argument that the December 12th interview was the fruit of a *Miranda* violation.

Additionally, Malloy contends that the December 12th interview should be suppressed because, during the November 15th interview, the police refused to honor Malloy's request for counsel. In the trial court, Judge Andrews agreed with Malloy that she had requested counsel during the November 15th interview, that the police had not honored this request, and that all of Malloy's ensuing statements during that interview had to be suppressed. Relying on *Edwards v. Arizona*[22], Malloy argues that her next two interviews—the interviews of December 12th and December 27th—should also be suppressed as the fruit of that violation.

 But *Edwards* applies only to suspects in custody.[23] We have upheld Judge Andrews's ruling that Malloy was not in custody during the November 15th interview. Moreover, even if Malloy had been in custody on November 15th, *Edwards* would not require suppression of the two later interviews because Malloy went home following the November 15th interview; that is, she did not remain in custody, and she had ample opportunity to consult an attorney before she returned to be re-interviewed on December 12th. Thus, any purported *Edwards* viola-

---

19. *See Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979); *see also Edwards v. State*, 842 P.2d 1281, 1284 (Alaska App.1992) (custody, for *Miranda* purposes, is determined by examining all of the objective circumstances of the interview and asking whether a reasonable, innocent person in the suspect's position would have felt free to break off questioning and, depending on the location of the interview, either leave or ask the police to leave).

20. *See Edwards*, 842 P.2d at 1285.

21. *Id.*

22. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

23. *See id.*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

tion would not taint Malloy's subsequent interviews.[24]

#### (d) The December 27th interview

With respect to this interview, Malloy renews her arguments concerning the purported *Miranda* and *Edwards* violations on November 15th. We have rejected those arguments, and we therefore conclude that the December 27th interview was not tainted on these grounds.

■ Malloy makes one other argument for suppression of the December 27th interview. This third interview took place following Malloy's arrest, and thus the police could not interrogate Malloy until she waived her right to counsel. Malloy contends that, although she was advised of her right to counsel, she never waived this right.

At the beginning of the December 27th interview, the following exchange took place between Detective Baker and Malloy:

*Detective Baker:* Before you can tell me a thing, I've got to read you these *Miranda* rights, and I want you to understand them. One of the rights that aren't on that card, though, is that you have the right to tell me your side of the story if you want to. Now I want you to understand that, because this is the last chance you're going to have to talk to me about this. You have the right to remain silent. Anything you say can and will be held against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. You understand each one of those?

*Malloy:* Uh-huh.

*Baker:* You want to ... put a different slant on this situation? Do you want to talk to me? Because right now it just don't look good.

*Malloy:* No, it doesn't.

*Baker:* And I think you could help yourself a lot.

*Malloy:* No, these aren't facts in here, so ...

*Baker:* Well, help me. Do you want to talk to me? Do you want to change these [facts]?

*Malloy:* Do I want to change them?

*Baker:* Do you want to tell me what the facts are? Do you want to talk to me?

*Malloy:* I'll talk to you all you want. I need to talk to a lawyer, though, obviously.

*Baker:* So you don't want to talk to me before you talk to a lawyer?

*Malloy:* Well, let me finish reading this, okay? Karri never saw me with that knife. When we got all the stuff—she helped me get all this stuff from Dee—he has tons of knives, he has tons.

*Baker:* This is just one element that we need to talk about.

*Malloy:* Okay.

 ...

*Baker:* [W]hat I am sure is [that] I cannot ask you a single question, I cannot accept a single answer, unless you waive your *Miranda* rights and agree to talk to me. That's the bottom line. Now, do you want to talk to me?

*Malloy:* I don't know what all that means, and that's why I want to ...

*Baker:* What it means is this: You have the right to remain silent. Do know what that means?

*Malloy:* Yeah.

*Baker:* You don't have to talk to me; I've told you that many times.

*Malloy:* Uh-huh.

*Baker:* Anything you say can be used against you in a court of law. That's pretty obvious, you know?

*Malloy:* Uh-huh.

*Baker:* You have the right to talk to a lawyer and have him present with you.

*Malloy:* I understand my rights.

*Baker:* That's what I mean.

*Malloy:* [But] I don't understand what you mean by "waiving" my rights.

---

**24.** *See Kochutin v. State,* 875 P.2d 778, 779 (Alaska App.1994).

*Baker:* All I want to know is, do you understand these [rights]?

*Malloy:* Yes, I do.

*Baker:* Okay. And understanding these rights, do you want to talk to me?

*Malloy:* I told you I'd talk to you.

Based on this record, we agree with Judge Andrews that Malloy knowingly waived her right to counsel and consented to be interviewed on December 27th.

For all these reasons, we uphold the admissibility of Malloy's three interviews with the police.

### 3. Evidence that Karri Rundle had previously assaulted her son and her family dog with knives

Prior to trial, the State asked Judge Andrews to issue a protective order that would preclude Malloy from introducing evidence that someone else might have killed K.H. In response, Malloy filed an *ex parte* application outlining the evidence she expected to present that would implicate Karri Rundle as the murderer. Based on Malloy's offer of proof, Judge Andrews ruled that Malloy was entitled to present her evidence and to argue that Rundle was the killer.

At trial, Malloy presented evidence that Rundle was present in the hotel room during the days leading up to the murder, and that Rundle had participated in the various assaults on K.H. A defense witness testified that Rundle had shown "extreme anger" toward K.H. in the days immediately preceding the murder and that, during an argument, Rundle had "lunged" at K.H. in a threatening manner. This same witness testified that it was Malloy who would try to calm Rundle down when she started to threaten K.H.

Malloy's son, J.M., likewise testified that Rundle repeatedly assaulted K.H. and that Malloy often tried to intervene to prevent these assaults. J.M. stated that, on one occasion when Rundle broke K.H.'s nose, Malloy stopped the fight and helped K.H. get cleaned up. During cross-examination of

J.M., Malloy's attorney elicited the fact that J.M. had previously stated that he heard Rundle tell K.H. that she would kill her. Finally, J.M. testified that Rundle possessed a knife similar in appearance to the one that the police suspected was used in the stabbing.

Rundle herself testified that she and K.H. had fought and that they were not on good terms. Rundle's animosity toward K.H. apparently stemmed from Rundle's belief that K.H. had reported her to DFYS in the early 1990's, and from her belief that K.H. had slept with her ex-husband when Rundle's children were present. Rundle admitted that, during the several days preceding K.H.'s death, she had hit K.H. and had cut K.H.'s hair to humiliate her.

Rundle also admitted that, on the night of the murder, she perceived that K.H. was seriously hurt and that she should probably go to the hospital, but she did nothing to assist K.H. Rundle further conceded that she disposed of K.H.'s boots in a dumpster after K.H. was killed. And Rundle admitted that, after the murder, she mailed K.H.'s backpack and other belongings to Washington.

Finally, Malloy's jury was informed that Karri Rundle had entered into a plea bargain with the State: Rundle would plead guilty to kidnapping and receive 5 years in prison in exchange for her testimony against Malloy.

But Judge Andrews prevented Malloy from introducing one type of evidence against Rundle: evidence that Rundle had previously assaulted her child and the family dog with a knife.[25] The judge found that the only relevance of this evidence would be to establish Rundle's criminal propensity, and that therefore this evidence was barred by Alaska Evidence Rule 404(b). Judge Andrews told Malloy's attorney:

*The Court:* If you can offer me something more—maybe there's some theory that makes [this evidence] relevant. But [it appears] to me [that] it's being offered

---

**25.** Specifically, Malloy offered to prove that Rundle had cut her son on the head while disciplining him, inflicting a wound that required twelve stitches to close. Malloy also offered to prove that Rundle had stabbed her son in the hand and arms while "playing a game with him", and that Rundle had stabbed the family puppy.

merely for the propensity that [Rundle] is willing to use knives against those she knows.... I agree [that] the knife makes it somewhat unique. And I am willing to listen to that argument.... [But] it's remote in time. [And] I have no information about the circumstances under which the wound [to Rundle's son] was inflicted. The victims ... are not closely aligned or similar....

■■■■ A judge's ruling concerning the admissibility of evidence under Rule 404(b) is to be upheld unless it constitutes an abuse of discretion.[26] Here, we find no abuse. The challenged evidence had no apparent relevance other then to establish Rundle's criminal propensity. As Judge Andrews noted, there was no obvious pattern to Rundle's knife assaults that would make them relevant to the murder of K.H.; the only apparent relevance of this evidence was to show that Rundle was an assaultive and cruel person who liked to inflict wounds with knives. Thus, the evidence was barred by Rule 404(b). Although this was sufficient reason to exclude the evidence, we further note that Judge Andrews allowed Malloy ample opportunity to present evidence and argument supporting her contention that Rundle was the murderer.

*4. Evidence of J.M.'s out-of-court statement that Malloy had admitted murdering K.H.*

Malloy's son, J.M., testified at her trial. The greater portion of his testimony was devoted to a description of the dynamics between K.H., Karri Rundle, and Malloy while they were living at the Spenard Hotel. J.M. testified that Rundle and Malloy had assaulted K.H. on various occasions. Toward the end of his direct examination, J.M. described how, one time when Malloy was drunk, she admitted to J.M. that she had killed K.H. According to J.M., his mother told him, "I killed [K.H.], you bastard."

■■■ At the beginning of the State's rebuttal case, the prosecutor announced that he intended to call John Sikkema, a clerk at the Spenard Hotel, as a witness. Sikkema stat-

ed J.M. would sometimes stop by and visit him, and that during one of their conversations—sometime in November or December, 1996—J.M. informed Sikkema that Malloy had confessed to murdering K.H. The prosecutor told the court that Sikkema's testimony was admissible because it represented J.M.'s prior consistent statement.

Under Alaska Evidence Rule 801(d)(1)(B), a statement that would otherwise be barred by the hearsay rule is admissible if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge ... of recent fabrication or improper influence or motive". Judge Andrews concluded that Sikkema's testimony concerning J.M.'s out-of-court statement was admissible under this rule because Malloy had asserted that J.M.'s testimony had been influenced by agents of the prosecution. The judge therefore allowed the State to present this testimony.

On appeal, Malloy asserts that this ruling was mistaken. She contends that the defense never asserted that J.M.'s testimony was the product of improper influence, and thus Sikkema's testimony was inadmissible hearsay.

■■■ Our review of the record convinces us that Malloy is correct; the defense did not attack J.M.'s testimony as being the product of improper influence. Judge Andrews's finding to the contrary is clearly erroneous, and therefore the State should not have been allowed to present Sikkema's testimony. But we are also convinced that this error does not require reversal of Malloy's conviction.

Malloy's trial lasted one month. The transcript of this trial spans almost 5000 pages. Sikkema's testimony on this point (both direct and cross-examination) occupies only 6 of these 5000 pages. When this case was argued to the jury, the prosecutor concentrated on the physical evidence. The prosecutor also focused on the testimony of two men. One of them, Eugene Emmons, was the night clerk who saw Malloy carry a barely-conscious K.H. away from the hotel and drive off in a car, then return to the hotel one

---

**26.** *See Garner v. State,* 711 P.2d 1191, 1194 (Alaska App.1986).

hour later without K.H. The other, George Dewberry, was the man who helped Malloy carry K.H. to the car. He testified that there was no blood on K.H. when she was carried to the car. Finally, the prosecutor asked the jury to consider the fact that Malloy repeatedly lied to the police about her actions and her knowledge of K.H.'s death, as well as the fact that Malloy boxed up the murder weapon and mailed it to Washington, instructing a friend to destroy the contents of the box.

The prosecutor's summation takes up over 50 pages of transcript. His discussion of J.M.'s testimony that Malloy had confessed to the murder one night when she was drunk occupies less than one page of this transcript. And the prosecutor mentioned Sikkema's rebuttal testimony in a single sentence: "And [J.M.] was so bothered by [his mother's admission], he told it to Jon Sikkema: 'my mother said she did this murder'."

We note that, although J.M. was a minor, he was an articulate teenager who testified at length and who was capable of conveying his account of events. Sikkema's challenged testimony did not add any details to J.M.'s description of his mother's confession; in fact, Sikkema told the jury that he could not remember J.M.'s exact words—only that J.M. had said that his mother admitted the murder.

For all of these reasons, we conclude that the error in admitting Sikkema's hearsay testimony did not appreciably affect the jury's verdict, and thus it does not require reversal of Malloy's conviction.[27]

*Conclusion*

We have rejected all of Malloy's claims of error except one, and we have found that one error to be harmless. Accordingly, we affirm Malloy's convictions for the crimes of first-degree murder, kidnapping, and tampering with evidence.

---

**27.** *See Love v. State*, 457 P.2d 622, 629–631 (Alaska 1969) (non-constitutional error does not require reversal of a criminal verdict unless the error appreciably affected the verdict).

*Issues Affecting the Validity of Malloy's Sentence*

1. *The constitutionality of the portion of AS 12.55.125(a) that mandates a 99–year sentence for first-degree murder under certain circumstances*

Malloy was convicted of first-degree murder. Since 1980, when Alaska's current criminal code went into effect, AS 12.55.125(a) has specified the penalty for this crime. For many years, AS 12.55.125(a) provided simply that first-degree murder carried a mandatory minimum term of 20 years' imprisonment and a maximum term of 99 years' imprisonment. But in 1992 the legislature amended AS 12.55.125(a), establishing a mandatory 99–year sentence for first-degree murder under specified circumstances.[28] The statute now reads:

A defendant convicted of murder in the first degree shall be sentenced to a definite term of imprisonment of at least 20 years but not more than 99 years[, except that a] defendant convicted of murder in the first degree shall be sentenced to a mandatory term of imprisonment of 99 years when

(1) the defendant is convicted of the murder of a uniformed or otherwise clearly identified peace officer, fire fighter, or correctional employee who was engaged in the performance of official duties at the time of murder;

(2) the defendant has been previously convicted of

(A) murder in the first degree under [Alaska law];

(B) murder in the second degree under [Alaska law]; or

(C) homicide under the laws of another jurisdiction when the offense of which the defendant was convicted contained elements similar to first degree [sic] murder under AS 11.41.100 or second degree [sic] murder under AS 11.41.110; or

(3) the court finds by clear and convincing evidence that the defendant subjected

---

**28.** *See* SLA 1992, ch. 79, § 23.

the murder victim to substantial physical torture.

As the parties prepared for Malloy's sentencing, the State gave notice that it intended to seek a mandatory 99–year sentence under subsection (3) of this statute by proving that Malloy subjected K.H. to substantial physical torture before killing her. Malloy objected that the amended statute was unconstitutional to the extent that it allowed the aggravating circumstances listed in subparagraphs (1)-(3) to be determined by the sentencing judge rather than the trial jury. Malloy argued that if the State wished to seek the mandatory 99–year sentence for first-degree murder, the State was constitutionally required to specially indict the defendant, pleading one or more of the aggravating circumstances, and to then prove the aggravating circumstance(s) beyond a reasonable doubt at the defendant's trial.

Judge Andrews rejected Malloy's attack on the statute. She concluded that the aggravating circumstances listed in the statute were penalty-enhancing factors that did not need to be alleged and proved at trial; rather, these factors were to be decided by the judge at sentencing. Although Judge Andrews expressed some reservations about the constitutionality of the statute, she ultimately concluded that it was constitutional. She then found, by clear and convincing evidence, that Malloy had inflicted substantial physical torture on K.H. and that Malloy should therefore be sentenced to the 99–year term mandated by the statute. Judge Andrews added, however, that even if the legislature had not mandated a 99–year sentence, she nevertheless would have sentenced Malloy to a 99–year term for the murder.

Malloy was also convicted of kidnapping. For this crime, Judge Andrews sentenced Malloy to 99 years' imprisonment with 60 years to serve, consecutive to the murder sentence. Thus, Malloy's composite sentence

is 159 years to serve—a sentence that Judge Andrews declared was designed to make sure that Malloy spent the rest of her life in prison without possibility of parole.

■■■ Because Malloy received this lengthy composite sentence, and because Judge Andrews declared that she would have sentenced Malloy to 99 years for the murder in any case, the State argues that Malloy's challenge to the sentencing statute is moot. But the State's argument overlooks the effect of AS 33.16.090(b), which declares that "[a] prisoner sentenced to a mandatory 99–year term under AS 12.55.125(a) . . . is not eligible for discretionary parole during the entire term." Because of this statute, Malloy stands in a substantially worse position than if she had received a normal 99–year sentence for first-degree murder. Even when Malloy's consecutive 60–year kidnapping sentence is taken into account, Malloy's eligibility for parole is still delayed for several years because of the mandatory 99–year term imposed under AS 12.55.125(a)(3).[29] We therefore conclude that we must resolve Malloy's attack on the statute.

*(a) The question presented, and the societal policies at issue*

The question presented here, in its most basic form, is whether AS 11.41.100(a) (the statute defining first-degree murder) and AS 12.55.125(a) (the statute prescribing the penalty for this crime) should be deemed to jointly create two separate offenses—two "degrees" of first-degree murder—or whether these two statutes should be interpreted in the usual way, with AS 11.41.100(a) defining the crime and AS 12.55.125(a) prescribing the penalty.

Malloy argues that, under the due process clause of the Alaska Constitution[30], the two statutes must be deemed to define two separate crimes—one, the normal offense of first-degree murder, committed whenever a per-

---

**29.** Under AS 33.16.100(d), "[a] prisoner who is sentenced . . . under AS 12.55.125(a), (b), (c), or (i) may not be released on discretionary parole until the prisoner has served . . . at least one-third of the period of confinement imposed. . . ." Malloy was sentenced under AS 12.55.125(a) for first-degree murder and under AS 12.55.125(b) for kidnapping. Had she received a normal 99–

year sentence for first-degree murder and a consecutive 60–year sentence for kidnapping, she would be eligible for discretionary parole after serving 53 years (one-third of 159 years).

**30.** Article I, Section 7.

son intentionally takes the life of another human being; and the other, an aggravated version of first-degree murder that requires proof of one or more of the circumstances listed in subsections (1)-(3) of AS 12.55.125(a).

Although Malloy has framed her argument in terms of the due process clause of Article I, Section 7, her claim also involves the right to jury trial guaranteed by Article I, Section 11. And because Malloy's crime is a felony, her claim additionally involves the right to grand jury indictment guaranteed by Article I, Section 8. For if Malloy is correct—if the aggravating circumstances listed in AS 12.55.125(a)(1)-(3) define a separate, aggravated form of first-degree murder—then these elements would have to be pleaded in the indictment, established at grand jury, and ultimately proved beyond a reasonable doubt to a trial jury.[31]

In our government of divided powers, the legislature defines crimes and establishes punishments.[32] The Alaska supreme court has explicitly recognized this principle:

> Save only as limited by constitutional safeguards, the legislature may choose any reasonable means to protect the people from the violation of criminal laws. In general, the comparative gravity of offenses and their classification and resultant punishment is for legislative determination.

*Alex v. State*, 484 P.2d 677, 685 (Alaska 1971) (citation omitted).

Thus, it is the legislature's function to define the crime of first-degree murder. It is likewise the legislature's function to decide whether a single penalty range should apply to all instances of first-degree murder, or whether first-degree murder should be punished more or less severely depending on the circumstances.

True, *Alex* speaks of "constitutional safeguards" that potentially limit the legislature's power. But the United States Supreme Court has indicated that the due process clause of the Fourteenth Amendment places very few restrictions on a state legislature's authority to define crimes. In particular, the Court has declared that the due process clause does not require states to define crimes in such a way that every circumstance affecting liability or punishment is an element of the crime.[33]

Alaska's presumptive sentencing statutes illustrate this point. Under AS 12.55.125(c), (d), (e), and (i), various presumptive terms govern the sentencing of all persons convicted of sexual assault in the first degree, sexual abuse of a minor in the first degree, and any class A felony, as well as repeat felony offenders convicted of a class B or class C felony. The applicability and length of these presumptive terms hinges on proof of factual matters—the offender's prior felony record, as well as various circumstances surrounding the offense that make the defendant's conduct more or less serious. And under Alaska law, it is the sentencing judge—not the jury—who decides whether these facts have been proved.[34]

In *Huf v. State* [35], we upheld this presumptive sentencing scheme against an attack very similar to Malloy's. We concluded that the legislature's decision to have the sentencing judge decide these underlying questions of fact did not violate a defendant's right to substantive due process or to trial by jury. We noted that the statutory provisions governing the various presumptive terms did not create new crimes or add new elements to the underlying felonies. Rather, the factors that triggered the various presumptive terms were "true sentencing provision[s]", and thus the legislature could constitutionally choose

---

31. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that, under the due process clause of the Fourteenth Amendment, a state government is obliged to prove every element of a criminal offense beyond a reasonable doubt).

32. *See* 21 Am.Jur.2d, *Criminal Law*, §§ 10–11, pp. 123–24.

33. *See Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987); *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

34. *See* AS 12.55.145(d).

35. 675 P.2d 268 (Alaska App.1984).

to have sentencing judges decide these matters.[36]

But our decision in *Huf* is not necessarily dispositive of Malloy's case. One of our main rationales for upholding the presumptive sentencing statutes in *Huf* was the fact that the presumptive terms do not create new penalty ranges for a defendant's crime; rather, they merely restrict a sentencing judge's authority within the established sentencing range.[37]

In contrast, the Alaska Supreme Court held in *Donlun v. State*[38] that when a statute lists particular circumstances that increase the maximum sentence for a crime, the statute must be construed as creating separate crimes. The aggravating circumstances listed in the statute must be deemed elements of the higher degree of the crime. Thus, a defendant is entitled to indictment and jury trial on those elements.

The statute at issue in *Donlun* was former AS 11.20.080, which defined burglary under Alaska's former criminal code. This statute declared that a person who committed burglary of a dwelling house was punishable by a sentence of up to 10 years' imprisonment; but if the burglary was committed at nighttime, the maximum punishment rose to 15 years, and if the dwelling was occupied, the maximum punishment rose to 20 years. The supreme court concluded that this statute actually codified three different offenses—that is, three different degrees of burglary.

[W]here a criminal statute provides for graded or enhanced ranges of punishments for aggravated instances of the proscribed offense, an indictment charging the offense must specify the aggravating facts before

the defendant can be exposed to an increased range of punishment.

*Donlun*, 527 P.2d at 473.[39]

A surprising and puzzling aspect of *Donlun* is the fact that the supreme court did not specify the legal basis of its decision; that is, the court did not explicitly state whether its ruling was based on statutory interpretation or on the provisions of the constitution—and, if so, which constitution. But the wording of the decision suggests that the court was relying on constitutional grounds rather than statutory construction. The supreme court did not discuss the legislative history of the burglary statute or the policies underlying that statute. Rather, the court stated its holding in the broadest of terms, declaring that its ruling applied to "[any] criminal statute provid[ing] for graded or enhanced ranges of punishments for aggravated instances of the proscribed offense".[40] This indicates that the court was stating a rule of constitutional law.[41]

An additional reason to interpret *Donlun* as resting on constitutional grounds is the historical importance of the right to trial by jury. The development of the common law in England was marked by a tension between the jury, as an expression of the popular will, and the judiciary, as the representative of established authority. Parliament engaged in the practice of barring the right to jury trial when it defined new, statutory offenses such as the Stamp Act and other statutes regulating trade within the British Empire. This practice was condemned by Blackstone, and it occasioned the protest in the American

36. *See id.* at 271–73.

37. *See id.* at 273.

38. 527 P.2d 472 (Alaska 1974).

39. *See also Tallent v. State,* 951 P.2d 857 (Alaska App.1997) (requiring the State to prove a defendant's prior theft convictions as an element of the offense when the defendant is prosecuted for second-degree theft under AS 11.46.130(a)(6)); *Ross v. State,* 950 P.2d 587, 589–590 (Alaska App.1997) (requiring the State to prove a defendant's prior DWI convictions as an element of the offense when the defendant is prosecuted for

felony DWI under AS 28.35.030(n)); *Morgan v. State,* 661 P.2d 1102 (Alaska App.1983) (requiring the State to prove a defendant's prior bootlegging conviction as an element of the offense when the defendant is prosecuted for felony bootlegging under AS 04.16.200(b)).

40. *Id.* at 473.

41. Recently, two members of the supreme court expressed the view that *Donlun* is premised on a defendant's right to due process. *See* the dissenting opinion of Justices Bryner and Fabe in *D.M. v. Division of Family and Youth Services,* 995 P.2d 205, 217–18 (Alaska 2000).

Declaration of Independence against the deprivation of the right to jury trial.[42]

Moreover, the Americans who drafted our federal constitution understood that the right to jury trial "could be lost not only by gross denial, but by erosion".[43]

One contributor to the ratification debates ..., commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in warning of the need "to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.

*Jones v. United States*, 526 U.S. at 248, 119 S.Ct. at 1226.[44] Thus, in *Jones*, the United States Supreme Court cautioned that serious Sixth Amendment issues would be raised by any statute that "diminish[ed] the jury's significance by removing [its] control over facts determining a statutory sentencing range".[45]

For these reasons, we interpret *Donlun* as stating a rule of constitutional law: when the maximum penalty for an offense hinges on the presence of aggravating factors, the offense is deemed to be divided into different degrees, and the specified aggravating factors are deemed elements of the greater crime(s). These elements must be alleged in the indictment, established at grand jury, and proved at trial.

Therefore, to resolve Malloy's challenge to AS 12.55.125(a), we must decide whether the challenged portions of AS 12.55.125(a) should be characterized as sentencing provisions, like the presumptive sentencing statutes challenged in *Huf*, or should be deemed to create separate offenses, like the statute challenged in *Donlun*.

**42.** *See Jones v. United States*, 526 U.S. 227, 245–46, 119 S.Ct. 1215, 1225, 143 L.Ed.2d 311 (1999).

**43.** 526 U.S. at 247–48, 119 S.Ct. at 1226.

**44.** Quoting *The Complete Bill of Rights* (N. Cogan, editor; 1997), p. 477.

**45.** *Id.*, 526 U.S. at 248, 119 S.Ct. at 1226.

**46.** *See State v. Wedge*, 293 Or. 598, 652 P.2d 773, 778 (1982) (examining a similar issue under the Oregon constitution's guarantee of jury trial, and

### (b) Analysis of AS 12.55.125(a) under *Donlun*

The State argues that the burglary statute construed in *Donlun* is distinguishable from the statute at issue in Malloy's case, AS 12.55.125(a), because the statute in *Donlun* not only specified the penalties for burglary but also defined that crime as well. In contrast, AS 12.55.125(a) deals purely with the penalties for first-degree murder; the crime itself is separately defined in AS 11.41.100(a). Based on this distinction, the State argues that AS 12.55.125(a) must be characterized as purely a penalty provision, and thus governed by this court's ruling in *Huf*.

But the State's argument begs the question. *Donlun* holds that when a "criminal statute provides for graded or enhanced ranges of punishments for aggravated instances of the proscribed offense", the statute must be construed as creating separate offenses. The *Donlun* rule is designed to protect a defendant's constitutional rights to have the State's case screened by a grand jury and, if a trial is held, to have a jury of the defendant's peers decide whether the defendant is guilty. If we are to enforce the *Donlun* rule and the constitutional rights that it safeguards, we can not allow the legislature's drafting style to govern our inquiry. If Malloy is correct—if the legislature has effectively created a separate, aggravated form of first-degree murder—then the fact that the elements of this crime are defined in a statute ostensibly devoted to sentencing will not defeat Malloy's right to grand jury indictment and jury trial on those elements.[46]

holding that the defendant's right to jury trial can not be defeated by the fact that the legislature has divided the elements of the crime and placed some of them in different statutes); *State v. Apprendi*, 159 N.J. 7, 731 A.2d 485, 492 (1999) (holding that the aggravating circumstances listed in a sentencing statute were not elements of the crime, but declaring that the legislature would not be allowed to circumvent a defendant's due process rights by placing elements of the crime in a separate sentencing statute).

The State next argues that AS 12.55.125(a) does not fall within the *Donlun* rule because, even when the State proves the aggravating factors specified in subsections (1)-(3), the defendant faces the same maximum sentence for first-degree murder. The State points out that the 99–year sentence mandated by AS 12.55.125(a)(1)-(3) is still within the normal sentencing range for first-degree murder (20 to 99 years). Because of this, the State argues that the 99–year sentence mandated by subsections (1)-(3) is just like the presumptive terms mandated by AS 12.55.125(c), (d), (e), and (i). That is, the mandatory 99–year sentence merely restricts a sentencing judge's discretion within the authorized range of penalties for the offense. Thus, the State concludes, *Huf* controls Malloy's case and the circumstances listed in subsections (1)-(3) must be deemed penalty enhancement provisions rather than elements of a separate crime.

We reject the State's characterization of the statute. AS 12.55.125(a) does not "restrict" the sentencing range for offenders who fall within subsections (1)-(3); rather, the statute abolishes the range of sentences in favor of a fixed 99–year sentence. Moreover, though this fixed 99–year sentence may appear to be at the upper boundary of the previously defined penalty range, it in fact represents a new, harsher penalty. Not only must the defendant receive 99 years to serve, but AS 33.16.090(b) declares that this 99 years must be served without possibility of discretionary parole.

True, sentencing judges have the authority under AS 12.55.115 to restrict a defendant's normal eligibility for parole—or deny it altogether. But we have previously held that a defendant receives a "maximum sentence" if he or she is sentenced to the maximum term of imprisonment, whether or not the sentencing judge restricts or denies parole eligibility.[47] That is, the mandatory sentencing provision in the first-degree murder statute not only requires sentencing judges to impose the maximum term of imprisonment that might have been imposed under prior law, but it also effectively requires sentencing judges to exercise their utmost power under AS 12.55.115 to restrict the defendant's parole.

For these reasons, we conclude that AS 12.55.125(a) establishes a separate maximum penalty for certain offenders convicted of first-degree murder, a penalty that is harsher than the maximum penalty specified for other offenders convicted of this crime. Thus, the *Donlun* rule presumptively controls our interpretation of AS 12.55.125(a), requiring us to construe this statute as creating two separate offenses—normal first-degree murder and aggravated first-degree murder—and requiring us to construe the circumstances listed in AS 12.55.125(a)(1)-(3) as additional elements necessary to prove aggravated first-degree murder.

*(c) The State's argument that Donlun does not accurately reflect federal constitutional law on this question*

The Alaska Supreme Court decided *Donlun* in 1974. The State argues that recent decisions by the United States Supreme Court show that *Donlun* is premised on a misunderstanding of a legislature's constitutional authority to define crimes and prescribe punishments.

The State relies especially on *Almendarez–Torres v. United States*[48]. In *Almendarez–Torres*, the Supreme Court construed a federal criminal statute that provided a greater maximum penalty if the defendant had a prior felony conviction.[49] Almendarez–Torres argued that, because his prior felony conviction triggered an enhanced maximum penalty, his felony conviction should be

---

**47.** *See Capwell v. State*, 823 P.2d 1250, 1256 (Alaska App.1991).

**48.** 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

**49.** The statute at issue in *Almendarez–Torres* was 8 U.S.C. § 1326. This statute prescribes the penalties for returning to the United States after

having been deported. This offense carries a maximum sentence of 2 years' imprisonment unless the defendant had been deported based on the commission of a crime. In that case, the maximum sentence is either 10 years' or 20 years' imprisonment (depending on the seriousness of the prior crime). *See Almendarez–Torres*, 523 U.S. at 228–29, 118 S.Ct. at 1223–24.

deemed an element of the offense—a fact to be proved to the jury at trial. But the Supreme Court ruled that this clause of the statute was merely a penalty-enhancing provision, not an element of the crime.[50] To reach this conclusion, the Court relied heavily on the assertion that recidivism "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence".[51] The Court also noted that an increase in the maximum sentence for a crime does not necessarily disadvantage a defendant in the same way that an increase in the mandatory minimum sentence would— for a sentencing judge is not obliged to impose the maximum sentence.[52]

If we were sure that *Donlun* was based on the Alaska Constitution, we might simply declare that *Almendarez–Torres* had no relevance to our inquiry. But, as noted before, the Alaska Supreme Court did not specify the legal foundation for its decision. Assuming for purposes of argument that *Donlun* relied on the federal constitution (so that we need to address the merits of the *Almendarez–Torres* decision), we nevertheless reject the State's contention that *Almendarez–Torres* is the answer to Malloy's case.

As noted above, the *Almendarez–Torres* decision relied heavily on the concept that recidivism is a "traditional" sentencing consideration. But this rationale is ultimately unconvincing. True, sentencing judges often—and properly—consider the fact that a defendant has committed previous crimes. But the same could be said of almost any other aggravating circumstance that the legislature might be expected to codify.

The United States Supreme Court implicitly recognized this problem in *Jones v. United States*.[53] In *Jones*, the Supreme Court construed the federal car-jacking statute, 18 U.S.C. § 2119, which provides a maximum penalty of 15 years' imprisonment unless the car-jacking results in serious bodily injury (in which case the maximum penalty is 25 years' imprisonment) or unless the crime results in death (in which case the maximum penalty is life imprisonment).[54] Even though the wording of this statute strongly indicated a congressional intent to create three different penalty provisions for a single crime, the Supreme Court construed the statute as creating three separate offenses—three degrees of crime.

The Court declared that it was adopting this interpretation of the statute in order to avoid confronting a "grave and doubtful constitutional question[ ]".[55] This question, said the Court, was whether, "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."[56]

In other words, the Supreme Court wanted *Almendarez–Torres* confined to its facts. The Court specifically held that *Almendarez–Torres* did not answer the broader question of whether the Sixth Amendment's right to jury trial prohibits Congress from enacting "penalty-enhancing" provisions that give sentencing judges the authority to increase the maximum penalty for an offense based on factors other than a defendant's recidivism. Thus, *Almendarez–Torres* does not answer the question of federal constitutional law presented in Malloy's case: whether the right to jury trial incorporated in the due process clause of the Fourteenth Amendment prohibits a state legislature from enacting a statute like AS 12.55.125(a)(3)—a statute that raises the maximum sentence for an offense based on a sentencing judge's finding that the defendant subjected the victim to "substantial physical torture".

50. *See id.*

51. *Id.* at 1230.

52. *See id.* at 1231.

53. 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

54. *See id.*, 526 U.S. at 238, 119 S.Ct. at 1218.

55. *Id.*, 526 U.S. at 239, 119 S.Ct. at 1222.

56. *Id.*, 526 U.S. at 243 n. 6, 119 S.Ct. at 1224 n. 6.

*(d) We adopt Donlun as a rule of law under the Alaska Constitution*

■ As explained in the previous section, federal constitutional law does not currently provide an answer to the issue raised in Malloy's case. Moreover, we cannot adopt the strategy used by the United States Supreme Court in *Jones*—i.e., employ rules of statutory construction to construe AS 12.55.125(a) as creating two separate varieties of first-degree murder, thus avoiding the constitutional issue. Such an interpretation of the statute would be clearly inconsistent with the legislature's intent.

AS 12.55.125(a)(3) specifies that the mandatory 99-year sentence is to be imposed when "the court finds by clear and convincing evidence that the defendant subjected the murder victim to substantial physical torture". Because the legislature has specified that the sentencing judge should be the finder of fact, and because the legislature has specified that the aggravating circumstance need be proved only by "clear and convincing evidence" (not "beyond a reasonable doubt"), it is obvious that the legislature did not view "substantial physical torture" as an element of the crime. We therefore cannot escape the constitutional issue.

Conceivably, we might try to decide Malloy's case on federal constitutional grounds, attempting to predict how the United States Supreme Court will resolve this constitutional question in the future. But, as explained above, the Supreme Court's decisions in this area provide little guidance. Read together, *Almendarez–Torres* and *Jones* indicate that

the Supreme Court finds this question troublesome and believes that the answer is uncertain.

Moreover, Malloy has expressly attacked AS 12.55.125(a) on state constitutional grounds. We therefore conclude that we must decide whether AS 12.55.125(a) comports with the guarantees of due process, grand jury indictment, and jury trial contained in the Alaska Constitution.

■ The Alaska Supreme Court has held that the right to jury trial guaranteed by Article I, Section 11 of the Alaska Constitution is broader than the corresponding right to jury trial guaranteed by the federal Constitution. *See R.L.R. v. State* [57] and *Baker v. Fairbanks* [58]. In large measure, these decisions are based on our supreme court's recognition that the trial jury's role as finder of fact is one of the fundamental aspects of American jurisprudence.[59] By requiring that a jury decide every question of fact required to establish a defendant's guilt, our law protects accused persons from the possibly unjust exercise of prosecutorial and judicial power.[60]

Similarly, both the supreme court and this court have recognized the importance of the grand jury review of felony charges guaranteed by Article I, Section 8 of the Alaska Constitution.[61] "[T]he purpose served by [the requirement of] grand jury indictment is to give one accused of a serious offense the benefit of having private citizens judge whether there is probable cause to hold the accused for trial. The grand jury protects the innocent from unjust prosecution...."[62]

**57.** 487 P.2d 27, 32–33 (Alaska 1971) (extending the right of jury trial to minors in delinquency adjudications). *Compare McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (holding that the federal Constitution does not guarantee juveniles the right to jury trial).

**58.** 471 P.2d 386 (Alaska 1970) (extending the right to jury trial to all criminal cases where the defendant faces any period of incarceration or the loss of a valuable license). *Compare Blanton v. City of North Las Vegas*, 489 U.S. 538, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989) (holding that the Sixth Amendment guarantee of jury trial does not apply to "petty offenses", defined as any offense punishable by 6 months' incarceration or less); *United States v. Nachtigal*, 507 U.S. 1, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) (a defendant

accused of driving under the influence of alcohol in a national park—a violation of an Interior Department regulation—is not constitutionally entitled to a jury trial).

**59.** *See State v. Browder*, 486 P.2d 925, 937 & n. 38 (Alaska 1971).

**60.** *See Green v. State*, 462 P.2d 994, 997 (Alaska 1969).

**61.** *See Adams v. State*, 598 P.2d 503, 510 n. 11 (Alaska 1979); *Morgan v. State*, 661 P.2d 1102, 1103–04 (Alaska App.1983).

**62.** *Adams*, 598 P.2d at 510 n. 11 (citations omitted).

Thus, the Alaska Constitution guarantees a broader right of jury trial than the federal Constitution, and it guarantees a right of grand jury indictment that is not guaranteed by the federal Constitution. Because of this, we conclude that the question raised by Malloy—though it may be "grave and uncertain" under federal law—does have an answer under the Alaska Constitution.

A defendant convicted of first-degree murder under the normal penalty provision faces a minimum sentence of 20 years' imprisonment and a maximum of 99 years' imprisonment. A defendant convicted of first-degree murder under the aggravating circumstances specified in subsections (1)-(3) faces a mandatory sentence of 99 years without possibility of parole. Given this great disparity, it is fundamentally unfair to require a defendant to make decisions about plea-bargaining and trial strategy without knowing whether the State will ask for the 99-year mandatory sentence. Indeed, the way AS 12.55.125(a) is written, the State need not decide whether to seek the 99-year mandatory sentence until the defendant's trial is over. Thus, a defendant who chooses to go to trial rather than plead guilty or no contest runs the risk that, during the trial process, evidence will come to light that will enable the State to argue that the defendant should be sentenced under AS 12.55.125(a)(1)-(3). Even if the trial does not reveal new evidence, the defendant still takes the risk that heated emotions engendered during the trial might prompt the prosecutor to re-evaluate the State's sentencing strategy and perhaps seek the mandatory 99-year sentence when the prosecutor otherwise would not have done so.

*Donlun* holds that, in circumstances like this—when a statute provides a different maximum penalty for an offense based on the presence of aggravating factors—the statute must be deemed to create separate offenses, and the specified aggravating factors must be treated as elements of the aggravated form of the offense. As explained above, the Alaska Supreme Court did not specify the legal basis for its decision in *Donlun*. But we note that the supreme courts of Oregon and Hawai'i have adopted the same rule based on their state constitutions' guarantees of trial by jury.[63]

Based on our analysis of *Donlun*, we hold that when a statute provides a greater maximum penalty for a crime based on specified aggravating factors, Alaska's guarantees of due process (Article I, Section 7) and of trial by jury (Article I, Section 11) require us to treat the statute as creating separate offenses, and to treat the aggravating factors as elements of the aggravated form of the offense. The defendant will not be subject to the greater maximum penalty unless the charging document specifies the pertinent aggravating factors and the State proves these aggravating factors beyond a reasonable doubt at the defendant's trial. If (as in Malloy's case) the alleged crime is a felony, then Alaska's guarantee of grand jury indictment (Article I, Section 8) also requires the State to establish the pertinent aggravating factors at grand jury.

We do not question the legislature's authority to require a 99-year sentence without possibility of parole for the most egregious forms of first-degree murder. But if such a sentence—a sentence that exceeds the normal maximum penalty for the crime—awaits the defendant upon conviction, then procedural fairness requires that the defendant receive notice of this possibility in the charging document. Moreover, to prevent erosion of the constitutionally guaranteed right to trial by jury, the government must be required to prove the aggravating factors to a

---

63. *See State v. Wedge*, 293 Or. 598, 652 P.2d 773, 777–78 (1982), *and State v. Tafoya*, 91 Hawai'i 261, 982 P.2d 890, 902 (1999). *See also Wadlow v. State*, 335 Md. 122, 642 A.2d 213 (1994) (adopting this same rule as a rule of statutory construction).

*But see State v. Thorne*, 129 Wash.2d 736, 921 P.2d 514 (1996), *and People v. Wiley*, 9 Cal.4th 580, 38 Cal.Rptr.2d 347, 889 P.2d 541 (1995) (rejecting the argument that a defendant's prior convictions must be deemed elements of the offense when proof of these prior convictions increases the maximum sentence). *See also State v. Krantz*, 241 Mont. 501, 788 P.2d 298, 303–05 (1990) (aggravating circumstances that increase the maximum sentence can be determined by the sentencing judge, but due process requires that these aggravating circumstances be alleged in the charging document).

jury of the defendant's peers, and to prove these factors beyond a reasonable doubt.

We thus construe AS 11.41.100(a) and AS 12.55.125(a) as jointly creating two offenses: first-degree murder and aggravated first-degree murder. The factors specified in AS 12.55.125(a)(1)-(3) are elements of aggravated first-degree murder. Before Malloy could be sentenced to the mandatory 99–year sentence for aggravated first-degree murder, the State had to allege these elements in the charging document and prove these elements beyond a reasonable doubt to Malloy's jury. This was not done. Because it was not done, Malloy could not be sentenced to the mandatory 99–year term.

*2. With the deletion of the restriction on discretionary parole, we affirm Malloy's composite sentence of 159 years to serve.*

■ We have just held that Malloy should not have been sentenced under the portion of AS 12.55.125(a) that mandates a 99–year sentence without possibility of discretionary parole. But, as explained above, Judge Andrews declared that she would have sentenced Malloy to 99 years' imprisonment even if the statute did not require it. Judge Andrews further declared, in imposing a consecutive 60–year sentence for kidnapping, that she believed that Malloy should receive a sentence of life imprisonment without parole. It is therefore clear that Judge Andrews would have imposed the same composite sentence even if she had predicted our ruling concerning the constitutionality of AS 12.55.125(a). The remaining question, then, is whether Malloy's 159–year composite sentence is excessive.

Judge Andrews found that Malloy had committed two separate offenses: a kidnapping that lasted for more than one week, followed by a murder. During the time that Malloy held K.H. in restraint, she subjected K.H. to repeated physical cruelty and abuse,

as well as sexual assault. Judge Andrews declared that Malloy:

> victimized [K.H.] in a way that is among the worst that the court has seen in terms of its sheer cruelty and humiliation and human debasement. [This victimization] was followed by a very cold and calculated murder ... a multiple [and] disfiguring stabbing. And then, [K.H.'s] body was left on a roadside next to a garbage can.... [I]t's hard for the court to characterize this as other than ... a worst offense within the description of kidnapping and murder. And on that basis, the court would find that Ms. Malloy is a worst offender.

The record fully supports Judge Andrews's findings.

Judge Andrews also specifically found that a composite sentence exceeding 99 years to serve was necessary to protect the public.[64] She declared that Malloy was "one of the most manipulative, brightest criminal defendants I've seen in my courtroom", and she found that Malloy was a "cold-blooded ... killer" with "virtually no rehabilitative potential". The judge found that consecutive sentences for the kidnapping and murder were necessary "not only to protect the public, but [also] to give teeth to the notion that there really were two [separate], very serious unclassified ... felonies committed in this case."

This court has upheld similarly lengthy sentences in cases of aggravated first-degree murder. For example, in *Harmon v. State* [65], this court affirmed consecutive sentences totaling 129 years, with no parole eligibility for 99 years, in a case involving murder and sexual assault. We noted that the defendant had engaged in deliberate cruelty and that the sentencing judge found that he had no prospects for rehabilitation.[66] And in *Alexander v. State* [67], this court affirmed a composite 198–year term with restricted parole for the kidnapping and first-degree murder of a high school student.[68]

**64.** *See Mutschler v. State,* 560 P.2d 377, 381 (Alaska 1977) (consecutive sentences exceeding the maximum sentence for a defendant's most serious crime should not be imposed unless necessary to protect the public).

**65.** 908 P.2d 434 (Alaska App.1995).

**66.** *See id.* at 444–45.

**67.** 838 P.2d 269 (Alaska App.1992).

**68.** *See id.* at 275–76.

The evidence in this case reveals that Malloy engaged in prolonged and horrific abuse of another human being, and that she then committed cold-blooded murder while her victim was helpless and incapacitated. In short, the record fully supports Judge Andrews's findings and sentencing conclusions. Based on those findings and conclusions, we hold that Malloy's 159–year composite sentence is not clearly mistaken.[69]

### Conclusion

We affirm Malloy's convictions for first-degree murder, kidnapping, and tampering with evidence. We further affirm Malloy's composite sentence of 159 years to serve. However, because Malloy could not be sentenced under the portion of AS 12.55.125(a) that mandates a sentence of 99 years without possibility of parole, we hold that Malloy's judgement must be amended by deleting the words "without parole" from Malloy's sentence on Count I (first-degree murder). Malloy will be eligible for discretionary parole at the normal time—after she has served one-third of her composite sentence.

With this modification, the judgement of the superior court is AFFIRMED.

---

**69.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).