**Charles DULIER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1760.**

Supreme Court of Alaska.

July 9, 1973.

---

4. 219 F.2d 324 (7th Cir. 1955).

5. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Olof K. Hellen, Asst. Public Defender, Juneau, Herbert D. Soll, Public Defender, Anchorage, for appellant.

William G. Mellow, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., John E. Havelock, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

CONNOR, Justice.

After trial by jury, Charles Dulier was found guilty of manslaughter and was given the maximum sentence of twenty (20) years imprisonment. Dulier appeals from both the judgment of conviction and the sentence imposed.

In the fall of 1971 Charles Dulier, his wife Syble, Glen Morlan, and John Bullard were the occupants of a small one-bedroom apartment in Juneau, Alaska, having dwelt there for several weeks. It appears that Charles Dulier exerted emotional and physical dominance over the other members of the group. Charles was the initiator of the "wink-nod" system of inflicting bodily injury upon members of the group. Charles would wink at one person and nod toward another. This meant that the one at whom he winked should physically attack and strike the one at whom he nodded. Failure to comply with these signals or to strike forcefully enough would bring about punishment of the one winked at by Charles.

About midnight on October 2, 1971, Charles and Syble returned to the apartment and woke the other two occupants in order to drink some wine and play cards. While playing cards, Charles engaged in the wink-nod game. The primary recipient of the violence was Bullard.

The prosecution's evidence, on which the jury's verdict was apparently based, showed the following. At about 2:00 a. m. on the night in question Bullard got up from the living room table and went into the bedroom to go to bed. Charles Dulier followed Bullard into the bedroom where noise could be heard as though someone were being pushed and shoved around. Charles Dulier came back into the living room and directed his wife to go into the bedroom and clean up Bullard. After she

returned, Charles made Glen Morlan go into the bedroom and commanded that Morlan fight Bullard. After this fight, Syble again cleaned up Bullard, while Morlan and Charles talked in the living room. During this conversation, Charles complimented Morlan on a job well done, but then struck a hard punch to Morlan's stomach, telling him that this was how he should strike Bullard. Morlan was sent into the bedroom a second time to fight Bullard. After Morlan returned on this occasion, Charles ordered Syble to go into the bedroom and "finish Bullard off." Syble then went into the bedroom and began choking Bullard. Bullard struggled and Syble called for assistance, which brought Morlan into the bedroom. At Syble's request Morlan held Bullard's arms while Syble finished strangling Bullard to death.

After the killing, Charles, Syble, and Morlan discussed disposal of the body. They contemplated carrying it up a nearby mountain and throwing it over a cliff. They abandoned such plans, however, and decided to report Bullard's death to the police. At about 10:00 a. m. on October 3, they walked to the Juneau police station and gave an account of Bullard's death. In an oral statement given to Captain Ciraulo at about 11:30 a. m., Charles rendered a completely exculpatory explanation of the death. At about 10:00 p. m., almost eleven hours later on the same day, and after Syble had explained the wink-nod game to the police, Charles was charged with second-degree murder. At that time he made two separate statements to the police, one of which was recorded, in which he admitted to playing the wink-nod game. He still denied any responsible participation in the killing.

At trial, the prosecution brought forth evidence that Charles had physically mis-

treated all of the other occupants of the apartment during several days previous to the murder. The evidence showed that Charles had severely pistol-whipped Bullard and had thrown a knife at him. At the time of death Bullard still had bruises and lacerations from those attacks. Charles had attacked Syble and knocked out some of her teeth. He had smashed a wine bottle in Glen Morlan's face. There was also testimony of a sexual attack by Charles on Glen Morlan several weeks previous to the murder.

Dulier advances three contentions on appeal: (1) that it was error to admit into evidence his second and third statements to the police,[1] (2) that it was error to allow the prosecution to introduce evidence of prior uncharged offenses, and (3) that his sentence is excessive.

■ As to the first issue, the warning required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was given to Dulier before he made the second and third statements, although he was not given a *Miranda* warning on the occasion of his first statement. On the facts of this case as related by the police officers and Dulier himself we have concluded that Dulier validly waived his *Miranda* rights before making the second and third statements. Even if we were to assume that he was entitled to a *Miranda* warning on the occasion of his first statement,[2] no taint would have attached to the second and third statements. His initial statement to Captain Ciraulo was not inculpatory. Additionally, the lapse of time between the first and succeeding statements was such that we are satisfied that the first statement was not causative of the second.[3] Admitting Dulier's second

---

1. His first statement was not put into evidence before the jury.

2. Because of our holding, it is unnecessary to pass upon Dulier's contention that his first interview by the police amounted to

custodial interrogation so as to require a *Miranda* warning at that time.

3. This is not a "cat-out-of-the-bag" situation where the defendant, having once confessed through application of unlaw-

and third statements into evidence was not error.

◼ As to the second issue, we hold that the probative value of the evidence of the previous uncharged offenses outweighed any possible prejudicial impact. This evidence, was, therefore, properly admitted. The evidence tended to show Dulier's control and domination of the other occupants of the apartment. It proved his complicity in the unlawful killing. Because the evidence completed the picture and set the stage for the offense being tried, it was admissible. Kugzruk v. State, 436 P.2d 962, 967 (Alaska 1968); McKee v. State, 488 P.2d 1039 (Alaska 1971). As to the testimony about a sexual assault on Morlan, somewhat less relevance is demonstrated. But we note that the sexual assault, which was touched upon briefly in the testimony of Morlan, was not emphasized by the prosecution, and the judge cautioned the jury not to consider that evidence except for the limited purpose of determining the state of mind of the witness Morlan. We find no abuse of discretion, and no error.

◼ As to the sentence appeal, we do not agree with Dulier that the sentence was excessive. The trial court considered the brutal nature of the crime, the defendant's character and attitude, and the need for the protection of society. The court had the benefit of psychiatric evidence which indicated that Dulier is a psychopath and is probably not amenable to treatment. In our opinion Dulier falls within the category of the worst type of offender for the crime of which he was convicted. We uphold the sentence. Galaktionoff v. State, 486 P.2d 919 (Alaska 1971). Meyers v. State, 486 P.2d 713 (Alaska 1972).

Affirmed.

ful police procedures, may be operating under coercive pressure of the original confession in his subsequent confession. United States v. Bayer, 331 U.S. 532,

540–541, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). Martel v. State, 511 S.W.2d 1055, 1973 (Alaska 1973).