Gabriel EDWARDS, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4117.

Court of Appeals of Alaska.

Dec. 11, 1992.

Scott Jay Sidell, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Gabriel Edwards was convicted of two counts of first-degree murder, AS 11.41.-100(a), and one count of first-degree arson, AS 11.46.400(a), following a jury trial in the Bethel superior court. He appeals both his convictions and his sentences. We reverse the superior court's ruling on Edwards's suppression motion, and we remand for further proceedings.

In the early morning of February 7, 1990, Bethel Police Officers John Bilyeu and Steve Brunger were called to investigate a fire that had occurred in a freezer van being used as a residence at 161 Seventh Avenue. Two bodies were found in the freezer van. At this point, the police did not know whether the fire had started from natural causes or had been set by an arsonist. The police also did not know whether the two people whose bodies had been found in the van had died of natural causes, had died accidentally in the fire, or had been the victims of homicide.

On the evening of February 8, Bethel resident Brenda Evans called the police and told them that Gabriel Edwards had visited the freezer van shortly before the fire. As a consequence of this telephone call, Officer Brunger interviewed Evans the next day (February 9). At this interview, Evans said that she had been socializing with Edwards on the night of the fire when Charlie Gregory arrived and told them that two bodies had been found in a freezer van. According to Evans, when Edwards heard this news, he accompanied Gregory to the freezer van to check the bodies—again, before the fire started.

Brunger and Bilyeu decided to interview Edwards that same day. They contacted him in another freezer van residence. Brunger and Bilyeu asked Edwards if he would be willing to talk to them; he agreed. The officers thought that the van was too crowded, (there were five people in the van, including the officers), so they suggested that Edwards come to the police station for the interview; Edwards again agreed.

Brunger and Bilyeu drove Edwards to the police station in their police car. The officers directed Edwards to an interview room, gave him some coffee, and then began the interview. At the commencement of the interview, the officers told Edwards that they wanted to speak to him about the fire. They explicitly told Edwards that he was not under arrest and that he could leave at any time.

However, the interview quickly became confrontational when Edwards claimed to have no memory of the fire; indeed, Edwards claimed to have no memory of anything other than being at Brenda Evans's house that night. The following conversation ensued:[1]

BRUNGER: You don't [remember anything after being at Brenda's house]?

EDWARDS: I don't know.

BRUNGER: You see, Gabe, we saw you at the fire that night, you got out of a cab.

EDWARDS: Oh, okay.

BRUNGER: And you weren't that fucked up.

BILYEU: I talked to you, Gabe. So right now, I'm going to read you your . . .

EDWARDS: Okay.

BILYEU: . . . rights, because right now, with the story . . .

EDWARDS: Okay, now, now I remember . . .

---

1. The following transcription contains several interruptions labeled "tape cut off": the police were using a voice-activated tape recorder that, because of malfunction, would sometimes cease recording in the middle of conversation.

BILYEU: ... (indiscernible) arrest you for murder.

EDWARDS: What the fuck, man, I was with, uh, Chris.

BILYEU: You'd better start talking.

EDWARDS: Well, he just, I just ...

BILYEU: Don't give us this "blacked out" bullshit.

EDWARDS: You just reminded me [that] I was with Chris.

BILYEU: ... stone-cold sober when I saw you.

EDWARDS: I was with Chris what's-his-name, Native dude, long hair, looks like a Chinaman.

...

BILYEU: [Did] you forget [about] talking to me at the fire?

EDWARDS: You just reminded me of that.

BILYEU: ... We know and have testimony [from] two people [that you were at] 161, [the scene of] the fire.

EDWARDS: Uh-huh. Before the fire started.

BILYEU: About one o'clock, one in the morning, and you went over there to see if somebody was dead. Now, Charlie Gregory gave you a name of somebody he thought was dead. Now what was it?

EDWARDS: I don't, I don't really remember.

BILYEU: Now, (tape cut off) going to be a witness or you're going to be a defendant.

EDWARDS: Fuck!

BILYEU: Because we saw you at the fire, Gabe. (Tape cut off) seen you sober, we've seen you drunk. (Tape cut off) sober side when we saw you at the fire, and that was about 3:30....

BRUNGER: You weren't that drunk; you might have been drinking, but you weren't that drunk, Gabe.

BILYEU: Two hours prior to that, you were leaving Brenda's, going over to 161, which is where the fire [was].

EDWARDS: I don't fuckin' know.

BILYEU: You went over to check a pulse. (Tape cut off) else did you check?

BRUNGER: Don't forget about checking a dead body; we're talking murder here.

BILYEU: Right now, Gabe, right now I'm not looking at you as a defendant.

EDWARDS: Well, fuck, I don't know, man; I can't fuckin' remember.

BILYEU: But unless you start talking to me ...

EDWARDS: Been drinking for a fuckin' few days, I don't fuckin' know ...

BILYEU: ... then I, well, I know you were sober that day and I also know that you don't like to cooperate with the police. (Tape cut off) also know and it's documented, that you were in a fight with Jimmy Joe [one of the people found dead in the freezer van].

At this point, Edwards began to speak freely with the officers about going to the van with Charlie Gregory and Brenda Evans, finding the bodies, and checking them for a pulse. Edwards did not, however, tell the officers that he had had any involvement in causing the deaths of the two people or in starting the fire. Following the interview, Edwards surrendered the clothes he had been wearing on the night of the fire so that the police could subject them to laboratory analysis.

Five days later, on February 14, the police reinterviewed Edwards. Edwards had been arrested on an unrelated charge and he was being housed at the Yukon–Kuskokwim Correctional Center. In the intervening five days, the police had received the autopsy results; the autopsy indicated that the two people had been murdered before their bodies were burned. The police had also discovered two eyewitnesses to the killing; these witnesses named Edwards as the murderer. The police informed Edwards of his *Miranda* rights, and Edwards consented to be interviewed. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Confronted with the newest results of the investigation, Edwards confessed to the murders at this February 14 interview.

After he was indicted for murder, Edwards asked the superior court to suppress the statements he made to the Bethel police

on February 9, as well as the results of the laboratory testing of his clothes and the confession he gave on February 14. Edwards asserted that he had been in custody for *Miranda* purposes during the February 9 interview, and thus his statements should be suppressed because the police did not give him the required advice of rights. Edwards also contended that his February 9 statement had not been voluntary.

Following an evidentiary hearing, the superior court denied Edwards' suppression motion in a one-page written order. That order reads, in pertinent part:

> [T]he motion is hereby DENIED. The court finds that the statement given by the Defendant on February 9, 1990, was voluntary and that the Defendant was not in custody at the time the statement was made. Therefore, the subsequent statements made on February 14 and 15, 1990, were not improperly tainted and are not suppressed.

On appeal, Edwards renews his claims that his February 9 statement was involuntary and that it was taken in violation of *Miranda*. We agree with the superior court that Edwards' statement was voluntary, but we find that the police violated Edwards' *Miranda* rights.

 A person who is questioned by the police while in custody must receive *Miranda* warnings. The test for custody is an objective one: would a reasonable person in the suspect's position have felt free to break off questioning and, depending on the location of the interview, either leave or ask the police to leave? *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979).

Even though Edwards was interviewed at the police station and was transported there in a police vehicle, the superior court could properly conclude that, when the interview began, Edwards was not in custody. *See Henry v. State*, 621 P.2d 1, 2–4 (Alaska 1980). Soon after the interview began, however, the officers threatened Edwards with arrest on a murder charge if he did not become more cooperative:

> BRUNGER: You don't [remember anything after being at Brenda's house]?
>
> EDWARDS: I don't know.

> BRUNGER: You see, Gabe, we saw you at the fire that night, you got out of a cab.
>
> EDWARDS: Oh, okay.
>
> BRUNGER: And you weren't that fucked up [intoxicated].
>
> BILYEU: I talked to you, Gabe. *So right now, I'm going to read you your . . .*
>
> EDWARDS: Okay.
>
> BILYEU: *. . . rights, because right now, with the story . . .*
>
> EDWARDS: Okay, now, now I remember . . .
>
> BILYEU: *. . . (indiscernible) arrest you for murder.*
>
> EDWARDS: What the fuck, man, I was with, uh, Chris.
>
> BILYEU: *You'd better start talking.*
>
> EDWARDS: Well, he just, I just . . .
>
> BILYEU: Don't give us this "blacked out" bullshit.

 Although the superior court concluded that Edwards was not in custody during this February 9 interview, we find that the superior court's conclusion is clearly erroneous. *Ridgely v. State*, 705 P.2d 924, 928–930 and n. 3 (Alaska App.1985), *rev'd on other grounds*, 732 P.2d 550 (Alaska 1987). Under the test announced in *Hunter*, the issue is whether a reasonable person in Edwards' position, upon hearing these words from Officer Bilyeu, would have believed that he was still free to leave if he wished to terminate the conversation.

 We are mindful that interviews between police and witnesses or suspects often become tense, angry, confrontational, or antagonistic. Such an atmosphere alone does not make the interview custodial for *Miranda* purposes. Compare *Thompson v. State*, 768 P.2d 127, 131 (Alaska App. 1989), holding that a defendant's statement was not rendered involuntary when the interviewing officer warned him that the district attorney's office might later interpret his silence as evidence of guilt.

But Officer Bilyeu was more than merely confrontational. Bilyeu informed Ed-

wards, in unmistakable terms, that he would immediately arrest Edwards on a murder charge unless Edwards became more forthcoming about his activities on the night of the fire. At that point, a reasonable person in Edwards' position would have concluded that he "was not free to leave and break off police questioning." *Hunter*, 590 P.2d at 895. Bilyeu had plainly told Edwards that his freedom to leave the police station was conditioned on his willingness to answer the officers' questions.

We therefore find that Edwards was in custody during this February 9 interview. Because Edwards was in custody and he did not receive *Miranda* warnings, his February 9 statement must be suppressed.

■ Edwards also argues that his February 9 statement was involuntary. A suspect's confession is involuntary for constitutional purposes when law enforcement officials use such coercive methods that they "overbear [the suspect's] will to resist and bring about confessions not fairly self-determined". *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). Traditionally, these outlawed methods include police threats to the safety or welfare of the suspect or other people the suspect holds dear. *See*, for example, *Lynumn v. Illinois*, 372 U.S. 528, 529–535, 83 S.Ct. 917, 918–921, 9 L.Ed.2d 922 (1963) (police officers threatened that, if the suspect did not confess, she would lose the income she currently received under the aid to dependent children program and, moreover, the child welfare authorities would take her children from her). The police are also barred from promising benefits such as immunity from prosecution that would cause a suspect to put aside normal efforts at self-preservation. *Smith v. State*, 787 P.2d 1038 (Alaska App.1990).

Edwards argues that his statement of February 9 was involuntary because the police officers threatened him with immediate arrest on a murder charge if he failed to talk to them. We have already ruled that this threat turned the interview into a custodial interrogation. However, we cannot agree that it rendered Edwards's state-

ment involuntary. The main impediment to such a finding is that Edwards, despite police pressure to talk, said nothing to directly inculpate himself in either the fire or the murders. He engaged in a calculated effort to assuage police suspicions and to make it appear that he was reluctantly but honestly cooperating with their investigative efforts.

■ In contrast to the *Miranda* test, which focuses on the objective facts of the suspect's encounter with the police, the test for whether a statement is voluntary rests in large measure on the subjective effect of the police conduct on the suspect's will. *United States v. Leon–Guerrero*, 847 F.2d 1363, 1365–66 (9th Cir.1988); *Sovalik v. State*, 612 P.2d 1003, 1006–07 (Alaska 1980); *Thompson v. State*, 768 P.2d 127, 131–32 (Alaska App.1989); W. LaFave & J. Israel, *Criminal Procedure* (1984), §§ 6.2(d) and 6.5(d), Vol. 1, pp. 449–451 and 484–85. On this record, we affirm the superior court's ruling that Edwards' will was not overborne by what the police said to him.

In conclusion, Edwards' statements to the police on February 9 were voluntary, but they must be suppressed because of the *Miranda* violation. Both Edwards and the State urge us to decide whether Edwards' February 9 interview tainted his decision to allow the police to inspect his clothing and his subsequent confession to the police five days later. However, the superior court did not reach these issues, and their resolution will require findings of fact that the superior court has not yet made. Regarding the consent to search, see *Frink v. State*, 597 P.2d 154, 167–69 (Alaska 1979). Regarding the subsequent confession, see *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Dulier v. State*, 511 P.2d 1058, 1060 (Alaska 1973); *Ridgely v. State*, 705 P.2d 924, 930 (Alaska App.1985).

Moreover, the present record is insufficient to allow us to judge whether the *Miranda* violation is harmless error or whether it requires us to reverse Edwards' conviction. As the State notes, Edwards does not explicitly argue that the admission

of the challenged evidence requires us to reverse his conviction, and the record on appeal does not contain a transcript of Edwards' trial. The absence of a trial transcript makes it impossible to decide whether the challenged evidence might have affected the outcome.

We therefore remand this case to the superior court. The superior court should determine whether Edwards' clothing and his February 14 confession must be suppressed on account of the *Miranda* violation. The State bears the burden proving that this evidence is not tainted. *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969); *see Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975) (the government bears the burden of showing that a defendant's illegal arrest did not taint his confession).

Upon completion of these proceedings on remand, the issue of harmless error will be ripe for review. Whatever the ultimate scope of suppression the superior court orders, Edwards (as appellant) will bear the burden of providing this court with an evidentiary record that allows us to determine whether the suppressed evidence might have affected the outcome of his trial. Edwards will need to supplement the record on appeal with transcripts of (a) his trial and (b) the proceedings on remand.

The superior court's ruling on the *Miranda* issue is REVERSED. Its ruling on the voluntariness issue is AFFIRMED. This case is REMANDED to the superior court for the further proceedings described in this opinion. Once these proceedings have been completed, it will be Edwards' responsibility to notify this court and to file a supplemental designation of the record on appeal. Upon certification of the supplemented record, the parties shall brief the remaining issues. Briefing will proceed in accordance with Appellate Rule 212, and either party may seek oral argument under Appellate Rule 213(a).

We retain jurisdiction of this case.