NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific*</u> <u>*Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

FRANK LEWIS ADAMS,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-10549
Trial Court No. 3PA-07-2037 CR

O P I N I O N

No. 2540 — February 17, 2017

Appeal from the Superior Court, Third Judicial District, Palmer, Beverly W. Cutler, Judge.

Appearances: Andrew Steiner, Bend, Oregon, for the Appellant. Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty and Craig W. Richards, Attorneys General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Frank Lewis Adams was convicted of murdering his girlfriend, Stacey Johnston, and tampering with evidence to cover up the homicide. In this appeal, Adams contends that various statements he made to the police following his arrest were obtained in violation of the *Miranda* rule and should have been suppressed.

In a separate argument, Adams contends that the superior court should have granted his motion for a new trial. Adams's request for a new trial was based on a claim of ineffective assistance of counsel — in particular, his trial attorney's failure to raise a confrontation clause objection to the State's expert testimony concerning the cause of Johnston's death. The testimony in question was given by Dr. Robert Whitmore, the state medical examiner. Dr. Whitmore did not personally perform the autopsy; rather, the autopsy was performed by another doctor — a doctor who died before Adams's trial. In Dr. Whitmore's testimony regarding the cause of death, he relied on observations made by the other doctor. Adams now claims that, because Dr. Whitmore relied on the other doctor's observations, Whitmore's testimony violated the confrontation clause.

Finally, Adams argues that his sentence is excessive in one respect. The superior court sentenced Adams to serve a total of 102 years in prison, and the court further ordered that Adams not be eligible for discretionary parole release during this term of imprisonment. Adams contends that the superior court lacked justification for imposing this parole restriction.

For the reasons explained in this opinion, we reject Adams's claims of error and we affirm the superior court's judgement.

*Facts relating to Adams's arrest and the first police interview*

In the early morning hours of July 28, 2007, a gas station attendant in Palmer called the police to report that a recent customer — a man driving a small red car

— was probably drunk. According to the attendant, the man was driving south on the Glenn Highway (*i.e.*, toward Anchorage).

A Palmer police officer located the vehicle and attempted to conduct a traffic stop, but the driver would not stop. Because the car was headed toward Anchorage, the Palmer police contacted the Alaska State Troopers and the Anchorage police, asking them to deploy spike strips on the highway. The Anchorage police placed spike strips on the highway near Peters Creek, and they were able to stop the car.

The car came to rest in a ditch alongside the highway. The driver — Frank Adams — was initially slumped over the steering wheel, but as the police approached the vehicle, Adams roused himself and picked up a tire iron. Adams told the police that he had crashed his small plane, and that his wife was dead.

When Adams refused to comply with police commands, the officers sprayed him with pepper spray and shot him twice with a Taser. After Adams was subdued, the police looked inside his car and saw what appeared to be a bundle of clothes. Upon closer inspection, this bundle turned out to be the body of Stacey Johnston.

Officers initially transported Adams to the police station, and then they took him to a hospital. While Adams was at the hospital, a police officer overheard Adams telling one of the hospital staff that he wanted a lawyer.

After Adams was released from the hospital, the police brought him back to the station. One of the officers who transported Adams back to the station told State Trooper Sergeant Leonard Wallner (one of the lead investigators in the case) that Adams had said he wanted an attorney.

Apparently, Sgt. Wallner inferred that Adams had said this directly to the transporting officer — because later, when Adams's suppression motion was litigated, Wallner testified that "the information ... I was given was that Mr. Adams had invoked

his rights, his constitutional rights as far as legal counsel", and that this invocation of rights "had been conveyed to patrol officers that were with him."

(Based on Wallner's testimony, the superior court premised its decision on the purported fact that Adams had told the officers who transported him from the hospital to the station that he wanted an attorney.)

When Adams was returned to the station, Sgt. Wallner and Anchorage Police Detective Glenn Klinkhart (the other lead investigator in the case) decided to speak to Adams and ascertain for themselves whether Adams wished to invoke his right to counsel.

When Wallner and Klinkhart entered the interview room, Adams appeared to be sleeping. (It was now 5:40 a.m.) After the officers awakened Adams, he told them, "I think I need an attorney." The following exchange then took place:

> *Det. Klinkhart*: Well, I wanted to just — I wanted to clarify that.

> *Adams*: [Well], I'm clarifying that.

> *Klinkhart*: All right. So you — you don't want to talk to me. You don't want to make any statements or say anything? Okay. You've already been at the hospital. Do you need anything else before we continue what we need to do? Okay.

> *Adams*: This just isn't happening.

> *Klinkhart*: Okay. All right. Well, ...

> [The video recording shows that, at this point, Klinkhart and Wallner began to leave the room, but Adams indicated — both verbally and with a gesture of his head — that he wished to speak to Sgt. Wallner.]

– 4 –

*Wallner*: You want to talk to me?

*Adams*: Yep.

*Wallner*: Well, we can talk. But I'm going to have to — you know, because you've already said [that you] want an attorney ...

*Adams*: Sir; yes, sir; no, sir.

*Wallner*: But I got to ...

*Adams*: I want an attorney, but I'd like [to] talk to *you* [referring only to Wallner, not Klinkhart] just a couple of minutes.

*Klinkhart*: You want — would you like me to leave, Mr. Adams?

*Adams*: Yes, sir.

*Klinkhart*: Okay. [The video recording shows that Klinkhart immediately walked out of the room.]

*Wallner*: Okay. Well, what I'm going to do, I'm going to read you your *Miranda* [rights] here, okay. ...

[Wallner then advised Adams of his *Miranda* rights. Adams acknowledged that he understood these rights, and he told Wallner that he had no questions concerning them.]

*Wallner*: Now, you said you want a — okay.

*Adams*: I just want to talk to you for just a minute.

*Wallner*: Okay, that's fine. I — just go ahead; I'll just listen.

At this point, Adams commenced a narrative description of the events of the preceding several hours. Wallner's contribution to the conversation consisted of numerous "okays" and occasional questions.

Adams told Wallner that Stacey Johnston was his girlfriend, and that they lived together in a cabin in Chickaloon. Adams was absent from the cabin for a while, and when he returned, he found Johnston "beat up" and dead. Adams told Wallner that he tried unsuccessfully to revive Johnston with CPR. When this was unsuccessful, Adams left the cabin and went looking for the person who he suspected had killed Johnston. Adams could not find this person, so he eventually returned to the cabin, put Johnston's body in his car, and started driving her "to town" (*i.e.*, to Anchorage).

Adams told Wallner that he and Johnston had recently tried to buy drugs from some people, and the transaction had ended badly — with the drug dealers threatening to kill them. Adams suspected that these drug dealers had murdered Johnston.

A little later in the interview, Wallner asked Adams if he would allow the police to search his cabin. The following colloquy ensued:

*Adams*: Sir, without sounding bad or anything ...

*Wallner*: Uh-huh.

*Adams*: I don't know what to do ...

*Wallner*: Okay. Okay.

*Adams*: ... right now. I need an attorney.

*Wallner*:  Okay.  Okay, I understand.

*Adams*:  Okay.

*Wallner*:  That's right; you just said that.  Okay.  Okay.

*Adams*:  (sighs) I just — I'm just telling you who ... you can go look at [*i.e.*, investigate] for this.

*Wallner*:  Okay.  Okay.  Okay.  Okay.  Okay.  Uh, ...

*Adams*:  Everything that you'll find, when you do go to that cabin, ...

*Wallner*:  Uh-huh.

*Adams*:  You look, everything is me and her, who love each other; and we wrote it down constantly.  ...  It's all over the place — from pictures, notes, in our Bible.

After Adams finished this description of things the police would find inside the cabin, Wallner asked Adams to describe the condition of Johnston's body when Adams found her, and the interview continued.

A little later, toward the end of the interview, Wallner asked Adams, "Is there anything else I didn't ask you [that] you think is important?"  Adams responded, "I need an attorney, but I [also] need to talk to narcotics officers".  Wallner asked Adams several questions about why he needed to speak to narcotics officers, and the interview ended shortly after that.

*Did the officers violate Adams's Fifth Amendment right to counsel during the first interview?*

As we explained in the preceding section, the superior court found that Adams told his transporting officers that he wanted a lawyer. Sgt. Wallner and Det. Klinkhart were informed that Adams had invoked his right to counsel, but they nevertheless decided to speak to Adams — to ascertain for themselves whether he indeed wanted to invoke his right to counsel.

Adams argues that Wallner and Klinkhart violated the rule of *Edwards v. Arizona* when they initiated this contact. [1]

*Edwards* holds that when an arrested suspect "express[es] his desire to deal with the police only through counsel", the suspect "[must not be] subject[ed] to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85, 101 S.Ct. at 1885.

For purposes of Adams's case, the crucial aspect of the *Edwards* rule is that, once a suspect in custody invokes their right to counsel, any later conversation between the suspect and the police must be suppressed unless the conversation is *initiated* by the suspect. It is not sufficient for the government to show that the suspect later waived their rights and voluntarily responded to police questioning. *Ibid.*

Here, Wallner and Klinkhart initiated the contact with Adams. Thus, their action seemingly violated the *Edwards* rule. The State argues, however, that the circumstances surrounding Adams's request for an attorney were unclear, and therefore Wallner and Klinkhart were entitled to seek clarification of Adams's wishes.

---

[1] 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Wallner testified that his purpose in contacting Adams was to ascertain for himself whether Adams indeed wished to invoke his right to counsel — because Wallner had not personally heard Adams's request for an attorney, but rather had learned about the request second-hand from one of the patrol officers.

On appeal, the State points out that, according to the patrol officer who actually heard Adams request an attorney, Adams was not being interrogated by the police (or even speaking to the police) when he made this request. Rather, Adams was being asked questions by a member of the hospital staff (a records keeper).

In its brief to this Court, the State relies on case law holding that suspects are not allowed to invoke their *Miranda* rights in *anticipation* that the police may try to interrogate them — that a suspect's request for counsel (or a suspect's announcement of their intention to remain silent) constitutes an invocation of *Miranda* rights only if it occurs at the initiation of, or during, custodial interrogation. [2]

In essence, the State is arguing that when the superior court found that Adams had invoked his right to counsel, the court's finding was either based on a mistaken understanding of the facts (*i.e.*, that Adams made this statement in response to police questioning, rather than to a hospital employee), or a mistaken understanding of the law (*i.e.*, that a suspect can invoke their *Miranda* rights before the police make any effort to conduct a custodial interrogation).

But when the superior court made its finding — that Adams was speaking to a patrol officer when he made his statement about wanting a lawyer — the only testimony that the court had heard on this issue was the testimony given by Sgt. Wallner

---

[2] *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3; 111 S.Ct. 2204, 2211 n. 3; 115 L.Ed.2d 1158 (1991); *Wilson v. Commonwealth*, 199 S.W.3d 175, 179 (Ky. 2006); *People v. Villalobos*, 737 N.E.2d 639, 645 (Ill. 2000); *State v. Mata*, 668 N.W.2d 448, 468 (Neb. 2003).

at a pre-trial hearing. At that hearing, Wallner told the court that "Mr. Adams had invoked his ... constitutional right[] [to] legal counsel", and that this invocation of rights "had been conveyed to patrol officers that were with him."

The patrol officer (the one who actually heard Adams's statement about wanting an attorney) did not testify until two weeks later, when he was called as a witness at Adams's trial. It is true that the patrol officer's testimony casts a different light on Adams's statement: according to the patrol officer, Adams was speaking to a hospital employee when he made the statement about wanting an attorney. But the State did not ask the court to resolve the discrepancy between Wallner's testimony and the testimony given by the patrol officer, nor did the State ask the court to reconsider its finding that Adams had invoked his right to counsel while speaking directly to the police.

Thus, even though there may be reason to doubt the superior court's finding of fact, we must proceed under the assumption that the court's finding was correct.

The next question is whether Wallner and Klinkhart violated the *Edwards* rule when they asked Adams to confirm his earlier statement about wanting a lawyer.

We initially note that, from a constitutional standpoint, it may make little difference whether Adams was talking to the hospital employee or to a patrol officer when he made his statement about wanting an attorney. Under either version of events, Adams's statement about wanting a lawyer was not made during custodial interrogation — and many courts have concluded that *Edwards* is only triggered when a person invokes their right to counsel during a custodial interrogation. Thus, Wallner and Klinkhart might have been permitted to ask Adams to clarify his position before they commenced the first custodial interrogation. See the discussion of these issues in Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Orin S. Kerr, *Criminal Procedure* (4th ed. 2015), § 6.9(g), Vol. 2, p. 976, and the cases collected in footnote 36.

We need not decide this question because, even assuming that Wallner and Klinkhart violated *Edwards* when they asked Adams to confirm that he wanted a lawyer, we are convinced that this violation did not taint Wallner's ensuing interview with Adams. The record — in particular, the video recording of the interaction between Adams and the two officers — shows that it was Adams's idea to talk with Wallner, and that Adams's conversation with Wallner took place at Adams's initiative.

Shortly after Wallner and Klinkhart entered the room and woke Adams, Adams re-affirmed that he wanted a lawyer. Wallner and Klinkhart did not try to dissuade Adams. Rather, the two officers were in the process of leaving the room when Adams affirmatively asked Wallner to stay behind and talk with him. Adams told Wallner, "I want an attorney, but I'd like [to] talk to you just a couple of minutes."

The video recording shows that Adams was addressing Wallner, to the exclusion of Klinkhart. Klinkhart understood this — because Klinkhart immediately asked Adams if Adams wanted him to leave the room. When Adams told Klinkhart that this was, indeed, what he wanted, Klinkhart left the room without further delay.

At this point, Wallner remained in the room with Adams at Adams's express request. Wallner advised Adams of his *Miranda* rights (including Adams's right to have an attorney present during any questioning). After Adams affirmed that he understood these rights, he again told Wallner, "I just want to talk to you for just a minute."

Even when the police have violated *Edwards*, a defendant's resulting statements are still admissible if the government shows that those statements were (1) initiated by the defendant and (2) not tainted by the preceding *Edwards* violation. *See Dorsey v. United States*, 60 A.3d 1171, 1195-96 (D.C. App. 2013).

Given the facts of Adams's case, we conclude that the State has met that burden here.

Adams alternatively argues that even if there was no violation of his *Miranda* rights at the beginning of the interview, Sgt. Wallner violated his *Miranda* rights in the middle of the interview — when, in response to Wallner's request for permission to search the cabin, Adams replied, "Sir, without sounding bad or anything, I don't know what to do right now.  I need an attorney."

According to Wallner's later testimony at the evidentiary hearing, he understood Adams to mean that he wanted to consult an attorney before deciding whether to consent to a search of the cabin.  The superior court also interpreted Adams's remark in this fashion.  Here is the court's ruling on this issue:

> *The Court*:  After all the discussion between [Adams] and Investigator Wallner, when Investigator Wallner says, "Okay, given everything you've told us, I guess ... we ought to go search the cabin ... , and will you give us permission to search the cabin?", the defendant then says, "Oops, well, I hate to — you know, I hate to do this to you, I'm apologizing, but if that's going to happen, I do want a lawyer".  ...  And so Investigator Wallner apparently abandons the issue of trying to get consent to search the cabin.  [And then] other things are talked about — again, completely of the defendant's own choosing.  ...  [T]he investigator is [not] playing games with the defendant to get him to say some more things instead of [getting him] a lawyer.

This Court has reviewed both the transcript and the video recording of the interview, and these materials support the superior court's conclusion that Adams invoked his right to consult an attorney with respect to the proposed search of the cabin, and not with respect to continuing his conversation with Wallner.

In sum, we conclude that, even assuming Wallner and Klinkhart violated Adams's *Miranda* rights (as interpreted in *Edwards*) by initiating contact with Adams,

– 12 – 2540

this violation did not taint Adams's ensuing interview with Wallner. Wallner and Klinkhart were leaving the room when Adams expressly asked Wallner to stay behind so that Adams could talk to him. We further conclude that Adams's mid-interview reference to needing an attorney was Adams's answer to Wallner's request for permission to search the cabin, not a more general invocation of Adams's right to consult an attorney before continuing the interview with Wallner.

*Did the officers violate Adams's Sixth Amendment right to counsel during the first interview?*

When Wallner and Klinkhart interviewed Adams, Adams had already been arraigned on several charges arising from the chase down the highway, and from Adams's resistance to the police when they were finally successful in stopping his car.

Those charges — reckless driving, driving under the influence, failure to stop at the direction of a law enforcement officer, and resisting arrest — were filed in a separate case in the Anchorage district court (File No. 3AN-07-8263 CR). At Adams's arraignment, the district court appointed an attorney to represent him in that Anchorage case.

Adams acknowledges that the Sixth Amendment right to counsel is case-specific — and that the appointment of counsel in one criminal case does not extend to a defendant's other uncharged criminal matters that are factually and legally unrelated. *See Carr v. State*, 840 P.2d 1000, 1005 (Alaska App. 1992). But Adams argues that the driving and resisting arrest charges in his Anchorage case are so closely related to the Palmer murder charge that the police could not interview Adams without obtaining the consent of his attorney in the Anchorage case.

2540

It is true that Adams's driving offenses led to the discovery of Johnston's body in his trunk. But that was the only connection between the Anchorage charges and the later murder charge. The Anchorage charges relied on different facts from the murder charge, and the elements of these charges did not overlap. We therefore hold that, even though an attorney had been appointed to represent Adams in the Anchorage case, Wallner and Klinkhart could interview Adams about the murder without obtaining this attorney's consent.

*Adams's claim that his waiver of* Miranda *rights at the beginning of the first interview was not knowing and intelligent*

In addition to the arguments addressed in the preceding section of this opinion, Adams also argues that his waiver of *Miranda* rights at the beginning of the first interview was not knowing or intelligent. Adams points out that he was drunk when he was arrested, that he was injured when his car crashed (after Adams ran the vehicle across the spike strips on the highway), and that the police subdued him with pepper spray and a Taser. Adams contends that, given these circumstances, his ostensible waiver of his *Miranda* rights at the beginning of the interview could not have been knowing and intelligent.

But Adams did not raise this claim in the superior court. Adams concedes that he never raised this claim as a ground of suppression, but he asserts that the *State* raised this issue when the State pointed out to the superior court that Adams was advised of his *Miranda* rights at the beginning of the interview, and that he waived them. Adams argues that, "[b]ecause the State raised the [issue] of waiver, the trial court was necessarily [required to] determin[e] whether [Adams's] waiver was intelligent and knowing." We do not agree.

A defendant who seeks suppression of statements made to the police must inform the trial court of the grounds for suppression. The fact that the parties mention a *Miranda* waiver in their trial court pleadings, or even the fact that the State affirmatively relies on a *Miranda* waiver when it responds to a defense motion seeking suppression of statements made during custodial interrogation, does not put the trial court on notice that the defendant is attacking the validity of the *Miranda* waiver.

This type of suppression claim is waived if it is not raised in the trial court. *See* Alaska Criminal Rule 12(b) and (e); *Snyder v. Division of Motor Vehicles*, 43 P.3d 157, 161 n. 9 (Alaska 2002). We therefore conclude that Adams has waived any claim that his *Miranda* waiver was invalid.

*Adams's claim that his statements during this first interview were involuntary*

Adams argues that his statements during this first interview were involuntary. In support of this argument, Adams relies on the same facts described in the preceding section of this opinion: that he was drunk when he was arrested, that he was injured when his car crashed, and that the police subdued him with pepper spray and a Taser. Adams asserts that, given these circumstances, the statements he made during the first police interview must have been involuntary.

But as this Court noted in *Edwards v. State*, 842 P.2d 1281, 1285 (Alaska App. 1992), and again in *State v. Garrison*, 128 P.3d 741, 750 (Alaska App. 2006), the determination of whether a statement is involuntary "rests in large measure on the subjective effect of the police conduct on the suspect's will."

Statements may be involuntary if police officers, through threats or other coercive measures, "undermine a suspect's will to resist and elicit a confession that

would otherwise not be freely given." *Malloy v. State*, 1 P.3d 1266, 1276 (Alaska App. 2000); *Edwards*, 842 P.2d at 1285. But even when the record reveals potentially coercive circumstances, a suspect's statements will be voluntary so long as the suspect's will has not been overborne.

For example, in *Edwards*, the defendant argued that his statement to police officers was involuntary because the officers threatened him with immediate arrest on a murder charge if he failed to talk to them. [3] We found that, despite this threat, the defendant's statements were voluntary: "The main impediment to ... a finding [that the statements were involuntary] is that Edwards, despite police pressure to talk, said nothing to directly inculpate himself in [the crime]." [4] Likewise, in *Malloy*, we found that the defendant's statements were voluntary, despite police threats, primarily because the defendant said nothing to directly inculpate herself. [5]

The facts of Adams's case lead to the same conclusion. Adams spoke at length to Sgt. Wallner, but he consistently maintained his own innocence and repeatedly asserted that Stacey Johnston had been murdered by drug dealers. We therefore conclude that Adams's statements were voluntary.

*Adams's second and third police interviews*

Adams also sought suppression of his second and third police interviews, but solely on the ground that these later interviews were tainted by the allegedly improper first interview. Because we have rejected Adams's attacks on the first

---

[3] *Edwards*, 842 P.2d at 1285.

[4] *Ibid.*

[5] *Malloy*, 1 P.3d at 1276.

interview, we conclude that there is no reason to suppress the second and third interviews.

> *Adams's claim that his trial attorney incompetently failed to raise a confrontation clause objection to the testimony of the state medical examiner*

Two days after Stacey Johnston's body was found in Adams's car, State Medical Examiner Franc Fallico performed an autopsy. Dr. Fallico concluded that Johnston's death was a homicide, and that her death was the result of multiple internal injuries caused by blunt-force trauma.

But by the time of Adams's trial, Dr. Fallico had died. The State therefore called Deputy Medical Examiner Robert Whitmore to testify about the autopsy results.

The State did not attempt to introduce the report itself. However, both the prosecutor and Adams's defense attorney asked Dr. Whitmore to offer his analysis of the physical observations and the laboratory test results recorded in the report.

Based on the information recorded in the autopsy report, Dr. Whitmore offered his opinion concerning the manner of Johnston's death (*i.e.*, homicide) and the mechanism of her death (injuries caused by blunt-force trauma).

After Adams was found guilty of murder (but before his sentencing), Adams's trial attorney, Scott Sterling, filed a motion for a new trial. In this motion, Sterling asserted that he had incompetently failed to raise a confrontation clause objection to Dr. Whitmore's testimony.

In his supporting affidavit, Sterling asserted that he should have objected to Whitmore's testimony after it became clear that Whitmore had not performed the autopsy himself, and that Whitmore would be relying on the photographs, laboratory test results, and other materials that accompanied the autopsy report. Sterling further

declared that his failure to object was the result of ignorance — that "[he] did not realize nor understand in advance of the trial, nor during the trial, that there existed a credible legal argument ... to object to Dr. Whetmore's [*sic*] testimony under the [decision in] *Crawford v. Washington* and other [related] cases[.]"

Sterling concluded that his failure to object to Dr. Whitmore's testimony constituted ineffective assistance of counsel, and that his incompetence materially prejudiced Adams's interests.

The superior court concluded that Sterling's affidavit (and the accompanying memorandum of law discussing the confrontation clause) failed to establish a prima facie case of ineffective assistance of counsel. The court therefore denied Adams's motion for a new trial. Now, on appeal, Adams renews his argument that Sterling was incompetent for failing to object to Dr. Whitmore's testimony.

*How the confrontation clause limits the government's ability to present expert testimony when the expert's analysis relies on observations or data generated by other people who do not testify at the defendant's trial*

Sterling's request for a new trial was based on his assertion that, under *Crawford v. Washington*[6] and ensuing cases interpreting the confrontation clause of the Sixth Amendment, there was a "credible argument" that Dr. Whitmore's testimony violated Adams's right of confrontation. But the existence of a "credible" or non-frivolous argument is not enough to justify Adams's request for a new trial.

As we explained in *State v. Steffensen*, 902 P.2d 340, 341-42 (Alaska App. 1995), many "colorable" legal arguments turn out to have no merit. Thus, when a claim of ineffective assistance of counsel is based on an attorney's failure to pursue a motion,

---

[6] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

the defendant must show (1) that the proposed motion would ultimately have been successful, (2) that any competent attorney would have pursued the proposed motion, and (3) that there is reason to believe that the ultimate outcome of the proceedings would have been different had the motion been granted. *Steffensen*, 902 P.2d at 342.

In *Vann v. State*, 229 P.3d 197 (Alaska App. 2010) (a case decided a little over a year after Adams's trial), this Court addressed the question of how a defendant's rights under the confrontation clause might limit the government's ability to present expert testimony when the expert's opinion is based on observations and/or testing performed by other people who do not testify. We summarized the prevailing view this way:

> We have found several cases where courts concluded that a defendant's right of confrontation was denied when the live witness's testimony simply recapitulated (and sometimes vouched for) the analysis performed by an absent witness. ...

> On the other hand, numerous courts have concluded that a defendant's right of confrontation is satisfied when an expert witness offers *their own* analysis or conclusion, even when that analysis or conclusion is based on test results derived from testing performed by someone else.
>
> . . .

> [For example, in] cases where the trier of fact must ascertain the cause of someone's death, courts have allowed medical examiners to give their opinion concerning the cause of death even though that opinion was based on the physical observations and laboratory results of an autopsy performed by another person: *see United States v. De La Cruz*, 514 F.3d 121, 132-34 (1st Cir. 2008); *People v. King*, unpublished, 2010 WL 98693, *3-6 (Mich. App. 2010).

*Vann*, 229 P.3d at 206-07 (some citations omitted).

In *Vann*, we adopted the following test for analyzing these confrontation clause claims: "[W]hen the government's expert is simply a conduit for an absent witness's analysis, [there is] a violation of the confrontation clause; but when the government's expert offers their *own* analysis, [even though] based in part on test data obtained from other people, ... the confrontation clause is satisfied." *Id.* at 206.

We acknowledged the danger that the underlying test data might be tainted by mistake, improper procedures, or even outright fraud. But we clarified that, standing alone, the mere speculative possibility of error in the underlying testing does not create a confrontation clause issue. *Id.* at 210-11.

*Vann* did not deal with autopsy testimony, but the approach taken in *Vann* reflects the majority approach among courts that have considered confrontation clause objections to autopsy testimony. This majority approach is exemplified by the New Mexico Supreme Court's decision in *State v. Navarette*, 294 P.3d 435 (N.M. 2013).

The *Navarette* court drew a distinction between two different aspects of an autopsy report. On the one hand, an autopsy report will often record "objective markers that any third [person] can examine". *Id.* at 443. On the other hand, the report may also include a type of observation that really qualifies as an analysis — for example, a pathologist's unsupported assertion that they observed (or did not observe) gun-powder stippling on the deceased's skin. *Ibid.*

The difference, the New Mexico court declared, is that some of the observations in an autopsy report "are not based on any scientific technique that produces raw data, but [rather] depend entirely on the subjective interpretation of the observer". *Ibid.* These subjective observations are not admissible unless the defendant has the opportunity to confront the witness who made them. *Ibid.* But the result is different when the government's witness offers their own opinion, based on raw data collected during the autopsy:

– 20 –

> [Not] all material contained within an autopsy file is testimonial and therefore inadmissible. Without attempting to catalogue all material in a file that could be admissible, we note that an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause. For example, [a pathologist who is] shown the autopsy photographs ... [may express] his own opinion about ... entry and exit wounds, explaining the basis for his opinion[, as long as he does] not simply parrot the opinion or subjective statement of the pathologist who performed the autopsy and took the photographs.

*Navarette*, 294 P.3d at 443 (citations omitted).

The West Virginia Supreme Court reached a similar conclusion in *State v. Kennedy*, 735 S.E.2d 905 (W.Va. 2012). The West Virginia court held that the confrontation clause bars the admission of an autopsy report prepared by a non-testifying pathologist, and further bars the testimony of a pathologist who did not perform the autopsy if this pathologist is serving as a "transmitter" for the opinions of the non-testifying pathologist who performed the autopsy. *Id.* at 920-21. However, the court ruled that the confrontation clause does *not* bar the second pathologist from testifying about their *own* opinions, even if those opinions are based on autopsy photographs and physical evidence collected during the autopsy. *Id.* at 921.

*See also United States v. Williams*, 740 F.Supp.2d 4, 9 (D. D.C. 2010) ("[The government's witness] may testify as to his own independent opinion concerning the cause or manner of [the victim's] death, even if that opinion is based in part on the inadmissible autopsy report."); *State v. Joseph*, 283 P.3d 27, 29 (Ariz. 2012) ("[A] testifying medical examiner may offer an opinion based on an autopsy performed by a non-testifying expert without violating the Confrontation Clause. ... Even if the

2540

autopsy report were itself 'testimonial,' [the witness] did not testify to any of [the earlier pathologist's] conclusions. ... He testified instead to opinions he formed after reviewing facts and photographs contained in the report.").

We have examined the testimony that Dr. Whitmore gave at Adams's trial. Applying the legal test that we have just described, it appears that almost all of the doctor's testimony would have been admissible even if Adams had raised a confrontation clause objection.

Much of Dr. Whitmore's testimony was devoted to describing what an autopsy is, what procedures normally take place before and during an autopsy, and what a pathologist looks for.

Dr. Whitmore clarified that Dr. Fallico was the one who performed the autopsy of Stacey Johnston's body. Whitmore then referred at length to the photographs that were taken during the autopsy, to the results of toxicology testing that was done in connection with the autopsy, and to the conclusions he (Whitmore) drew from this information. Each time Dr. Whitmore offered opinions about what those photographs and test results showed, and when he gave his ultimate opinion about the cause of Stacey Johnston's death, those opinions were based on his own analysis of the raw data.

It is true that, at six points in his lengthy testimony, Dr. Whitmore explicitly relied on Dr. Fallico's observations (as recorded in the autopsy report): that there were no injuries to Johnston's palms; that Johnston was 67 inches tall and weighed 117 pounds; that there were fractures on both sides of Johnston's ribs and multiple contusions between her ribs; that Johnston's body had older bruises that were healing; that there were injuries to Johnston's tongue; and that a cloudy pink liquid was present in her stomach.

Conceivably, these particular answers might not have survived a confrontation clause objection. But given the wealth of information contained in the rest of

Dr. Whitmore's testimony, a defense attorney would not be incompetent for failing to object to these answers. Moreover, given the way Adams's case was litigated (*i.e.*, the prosecution and defense theories of the case), there is essentially no possibility that the admission of these answers affected the verdict.

To prevail in his motion for a new trial, Adams had to show that no competent criminal defense attorney would have failed to object to Dr. Whitmore's testimony on confrontation grounds, and also show that such an objection would have been successful. [7] But as we have just explained, the great majority of Dr. Whitmore's testimony would have survived a confrontation clause objection under this Court's decision in *Vann*, and under the similar tests adopted by several other courts from around the country.

Even if Dr. Whitmore's testimony would be excluded under some courts' interpretation of the confrontation clause, this would merely show that American jurisdictions disagree regarding the admissibility of such testimony. The question is whether any competent criminal defense attorney practicing in Alaska would necessarily raise a confrontation clause objection to Dr. Whitmore's testimony. The answer to this question is "no" — and this is true regardless of whether our decision in *Vann* controls this issue or whether, instead, *Vann* does not control and the law remains unsettled. See *State v. Adams*, 2012 WL 2308131, *3-5 (Ohio App. 2012), where the Ohio Court of Appeals rejected a similar claim of ineffective assistance of counsel, because of the unsettled state of the law.

Thus, even though Adams's trial attorney was willing to accuse himself of incompetence, Adams's motion for a new trial did not set forth a prima facie case of attorney incompetence. Accordingly, the superior court correctly denied that motion.

---

[7] *See State v. Steffensen*, 902 P.2d at 341-42.

*Was the superior court clearly mistaken when, at sentencing, it ordered*
*that Adams would not be eligible for discretionary parole?*

Adams was convicted of first-degree murder, and he therefore faced a sentence of 20 to 99 years' imprisonment. [8] The superior court sentenced Adams to the maximum term — 99 years. For the separate crime of evidence tampering, the court sentenced Adams to a consecutive term of 3 years. Thus, Adams's composite sentence was 102 years to serve. In addition, the court exercised its power under AS 12.55.115 to eliminate Adams's eligibility for discretionary parole release during this composite term of imprisonment.

On appeal, Adams argues that the superior court abused its sentencing discretion when it restricted him from applying for discretionary parole.

First, Adams argues that the superior court failed to adequately explain its decision to eliminate his eligibility for discretionary parole. But the State's sentencing memorandum contained a lengthy explanation of why the State was asking the court to impose this parole restriction, and the sentencing judge declared that her decision was based on the factors listed in the State's memorandum:

> *The Court*: Every sentence of the State's argument about why [Mr. Adams] should be ineligible [for discretionary parole] ... is [supported by] the proof in this case. And ... almost all of the cases that [the State] refer[s] to [in its pleading] are less serious than [Mr. Adams's] case.

In the relevant portion of the State's sentencing memorandum, the State asserted that Adams's killing of Johnston was an act of "gratuitous violence", committed

---

[8] AS 12.55.125(a).

for "no [apparent] reason". The State noted that Adams "beat her with such force that her face was not recognizable".

The State also noted that Adams had an "extensive history of violence". Adams committed a brutal homicide when he was a teenager (see this Court's description of this crime in *Cassell v. State*, 645 P.2d 219, 220 (Alaska App. 1982)), and he committed other acts of violence against a former wife and a former girlfriend.

Finally, the State contended that Adams's history within the justice system, and his repeated criminal acts, showed that he had little prospect of rehabilitation.

These assertions, expressly adopted by the sentencing judge, constitute a sufficiently detailed explanation of the judge's decision to impose the parole restriction.

Adams argues in the alternative that even if the judge gave a sufficiently detailed explanation of her decision, this explanation does not adequately justify the judge's decision. We disagree.

As the sentencing judge noted in her sentencing remarks, Adams had committed a prior homicide, and he had two other felony convictions (one for assault, the other for criminal mischief). Two of Adams's former domestic partners testified that he committed acts of severe violence against them. The judge told Adams:

> *The Court*: [Y]ou really are an extreme danger to other persons. ... [F]or whatever reason, you just cannot internalize and act upon the requirement[s] of conforming your conduct to the law [and] respecting other people's privacy and their right to life.

Adams does not directly challenge any of the judge's remarks, other than to argue that no one can know for certain whether he will continue to be dangerous 34 years from now (*i.e.*, when he would have been eligible to apply for discretionary parole if the sentencing judge had not restricted his parole eligibility).

But Adams was in his mid-forties when he committed the murder in this case, and (according to the pre-sentence report and the testimony at his trial) Adams has committed a number of serious assaultive crimes since he was a teenager. In light of this record, the sentencing judge concluded that Adams's only prospect for rehabilitation was "the faint hope that ... [someone] might actually turn out ... different than anticipated."

The judge's finding on this issue is supported by the record, and we therefore conclude that the judge was not clearly mistaken when she denied parole eligibility to Adams.

*Conclusion*

The judgement of the superior court is AFFIRMED.